## PITTS et al. v. WEAKLEY et al., Appellants.

155   109
100a  4723

### Division One, March 14, 1900.

1. **Trusts:** ORAL TESTIMONY. An express trust in personalty may be established by parol testimony.

2. ———: ———: GIFTS: NECESSARY EVIDENCE. But a court has no more power to add to the trust as made by a deceased person than it has to add to his will or make a contract for living persons. If the evidence shows that property was given by a deceased parent to a child for a purpose, but leaves in the dark what that purpose was, the court can not declare it to be a trust, but will leave it as the donor left it. The evidence must show that the donor declared the trust at the time of the delivery of the property to the donee, and designated the terms thereof, its beneficiaries, and the proportions each was to take in the property.

3. ———: CHARACTER OF EVIDENCE. Loose, vague and indefinite expressions are not sufficient to fasten the character of a trust on property in the hands of a person who *prima facie* is the owner.

4. ———: ———: ADMISSIONS: CONCLUSIONS OF LAW. And where the trust is sought to be established by oral admissions of the donee, whose lips are closed by the death of the donor, the evidence should be received with great caution. And in this case such admissions, not being the words of the donor, but at most a statement by donee's husband in her presence of his understanding of the purpose of the gift, are held to be mere legal conclusions and incompetent.

Appeal from Buchanan Circuit Court.—*Hon. Chas. F. Strop,* Judge.

REVERSED AND REMANDED (*with directions*).

*Brown & Dolman* for appellants.

(1) While by the terms of the Statute of Frauds trusts in real property are required to be manifested and established by written evidence and trusts in personalty are left to be established by either written or oral evidence, there is no difference

in the character or extent of the words necessary to create them, whether those words be written or spoken. The only difference is in the character of the evidence necessary to prove the use of those words. The subject-matter of the trust, its purpose, the persons who are to take the beneficial interests and the nature and extent of those interests, must be as clearly expressed in one case as in the other. In re Estate of Soulard, 141 Mo. 664; Bispham's Equity, 65; Cruwys v. Coleman, 9 Vis. 323; Smith's Estate, 143 Pa. St. 436; Perry on Trusts, sec. 83. (2) The things necessary to be proved by plaintiffs in order to a recovery in this case are, that a trust was declared by Steele at the time he delivered the certificate to Mrs. Weakley, and the terms of that trust, its beneficiaries, and the proportions in which they were to take; and this proof must conform to the charges in the petition. The intention to create a trust by parol must be plainly manifested and not derived from loose, equivocal expressions of parties made at different times and upon different occasions. Bispham's Equity, 65; Slocum v. Marshall, 2 Wash. 397; Steere v. Steere, 5 John. Ch. 1; 2 Story Eq. Jur., sec. 979a; Darling v. Potts, 118 Mo. 506; Ringo v. Richardson, 53 Mo. 385; Johnson v. Quarles, 46 Mo. 423; Kennedy v. Kennedy, 57 Mo. 73; Allen v. Logan, 96 Mo. 592.

*Thos. F. Ryan, Jas. W. Boyd* and *John. M. Stewart* for respondents.

(1) No particular form of expression is necessary and requisite to create a valid and binding trust. Schumaker Estate, 61 Mo. 592. (2) Words of mere entreaty, or confidence, etc., are sufficient to create a trust when, if taken in connection with the circumstances surrounding the parties at the time, it can be inferred that the donor's intent was to create a trust. 1 Beach on Trust and Trustees, sec. 70.

(3)   The existence of a trust may be shown by the statements, declarations or admissions of the trustee.   Perry on Trusts, sec. 82; Chase v. Chapin, 130 Mass. 128; Siebold v. Christman, 75 Mo. 308; Prise v. Kane, 12 Mo. 412; Garrish v. Institution, 128 Mass. 159; Davis v. Coburn, 128 Mass. 377.   (4)   In determining whether the transfer of personal property was intended as a gift or in trust, the circumstances surrounding the parties are very material, and a trust in personalty may be implied or may result from certain circumstances requiring its existence for the purpose of equity. Porter v. Bank, 19 Vt. 410; Chadwick v. Chadwick, 59 Mich. 87; Huettelmann v. Viesselman, 48 Mo. App. 582.

VALLIANT, J.—Plaintiffs and defendant, Susan Weakley, are the children and only heirs at law of Dudley M. Steele, deceased.   The object of this suit is to establish by decree a trust in favor of plaintiffs and their sister, Mrs. Weakley, in 794 shares of stock which were given to the latter by their father shortly before his death, which occurred March 10, 1896.

The petition states that plaintiffs' father caused the certificate of the stock to be made out in the name of his daughter, defendant Susan Weakley, in August, 1895, but did not deliver it to her then nor inform her of it but retained it in his possession until March 1, 1896.   The act of creating the alleged trust and its terms are thus stated in the petition:

"On or about the 1st day of March, 1896, said Dudley M. Steele, being then aged and infirm, and desiring to make some suitable provision for all his children alike, handed to her, said Susan Weakley, the said certificates of stock, and gave her possession thereof, not for her own use and benefit, but in trust for the use and benefit, of all his children in equal proportions."   The petition also states that at the time, this stock was the only property Dudley M. Steele owned;

that after receiving the certificate Mrs. Weakley transferred it to her husband without consideration, under his influence and persuasion, in order to avoid the trust, and he now holds it; that defendants Woodson, Lemon and McDonald, as a committee or trustees, have some interest in the stock as collateral for the security for certain debts of which the plaintiffs are not particularly informed, but that these debts are otherwise sufficiently secured. The prayer is that the title to the stock be divested out of Weakley and vested in plaintiffs and Mrs. Weakley in equal proportions, that the old certificates be cancelled and new ones issued to the parties respectively as their interests appear, to be held subject to any lawful claim of the defendants Woodson, Lemon and McDonald.

The answer of defendants was a general denial.

The trial resulted in a decree for the plaintiffs as prayed, from which in due course the defendants have appealed.

In order to properly appreciate the evidence upon which the respondents rely to prove the terms of a trust as charged in their petition, which evidence consists alone in the testimony of witnesses as to the admissions alleged to have been made by Mrs. Weakley after her father's death, it is important that we should weigh it in the light of the circumstances which surround the case. The following is a fair history of the case, taken from appellants' statement:

"In 1894 the wholesale grocery firm of Steele & Walker and a corporation named the Midland Coffee Company failed, and severally assigned their property for the benefit of their creditors to the defendant Armstrong B. Weakley and one W. W. Wheeler. Mr. Dudley M. Steele seems to have been practically the owner of the corporation as well as of the partnership, and his private fortune and credit being of course involved with the latter he made at the same time a personal assignment to the same assignees. These proceedings were all in Buchanan county, Missouri, where Mr. Steele resided and the business was situated. Although the amount

of the property and indebtedness involved in these transactions is not stated in the record, there is enough to show that it was very large.   The formation of the defendant corporation, the stock of which is the subject of this suit, grew out of these assignments under the following circumstances:

"On the 8th day of August, 1894, the creditors of these insolvent concerns......made him a proposition in writing, providing that a corporation be formed under the laws of the State of Missouri of which he should be president with a salary of $5,000 per year.   This corporation was to execute its notes to each of the creditors of the several assignors for an amount to be ascertained by a schedule of percentages set forth in the proposition, divided into three equal amounts, payable in six, twelve and eighteen months, with interest at five per cent per annum.   These notes were to be delivered to the defendants John S. Lemon, S. C. Woodson and R. L. McDonald, constituted a committee on behalf of the creditors, clothed with extraordinary powers over the corporation and its directors and officers, and upon the execution and delivery of the notes the indebtedness was to be assigned to the corporation.

"It was further provided that the corporation should cause all its capital stock, with the exception of one share to each of its directors, to be placed in the name of some person to be selected by the committee, on the books of the corporation, the 'certificate to be endorsed and accompanied by irrevocable transfer in blank, and so delivered to the committee, and shall also cause to be delivered to the committee with the certificate, the irrevocable powers of the proxies of the holders on said books to said committee, authorizing them and each of them to vote the stock at all stockholders'. meetings, so long as any of said notes remain unpaid, and shall provide by said contract to be made by the corporation that the stock shall be held by the committee as collateral for the payment of the notes, and that if default

be made in the payment of the notes or any of them, or of the interest thereon, the committee may sell the stock, or so much thereof as may be necessary, at public auction in the city of St. Joseph, Missouri, first giving notice by twenty days' publication in a newspaper published in the city of St. Joseph, and apply the proceeds to the payment of the notes unpaid and interest *pro rata*.'

"It was further provided that the committee should continue until all the notes to be given by the corporation should be paid, and that 'then the committee shall transfer or cause to be transferred said stock to D. M. Steele or any other person or persons whom he may designate in writing addressed to said committee.'

"This corporation was organized in December, 1894, the entire property of the assigning concerns was turned over to it and it entered upon the performance of the unique object of its existence—the payment of the debts represented by its notes out of the assigned property, and it was engaged in that business up to the time of the trial.

"Mr. Weakley was allowed by the court $5,000 for his services as assignee, which he turned over to Mr. Steele to assist him in the liquidation of his indebtedness. He took Mr. Steele's personal note for this which was never paid, Mr. Steele having nothing to pay it with.

"At the time the assignments were made there was a private banking firm doing business at Bellville, Republic county, Kansas, under the firm name of Davis, Steele & Company, which was placed in the hands of a receiver. Its liabilities were about $50,000 with assets sufficient to pay possibly 50 or 60 per cent.

"About $12,000 of these claims were presented to and allowed by the Missouri assignees, and it was necessary to the acquisition of the assigned property by the corporation that these allowances be otherwise secured. The family homestead was the property of Mrs. Dudley M. Steele, who had

died between the time of the assignment and the settlement, and this property had consequently passed to Mr. Steele and her children, Webb Steele, the minor, and Mrs. Pitts and Mrs. Weakley. Mr. Steele, Mrs. Pitts and Mrs. Weakley joined in a deed of trust upon this property to Edward C. Smith, trustee, to secure any deficiency of these debts after the application of the Davis, Steele & Company assets. This instrument was executed by the two daughters at the request of Mr. Steele and to prevent the compromise from falling through. The property was, at the time of the trial, in the possession of the trustee, who was managing it in the interest of the trust.

"Twelve or thirteen thousand dollars more of the claims against Davis, Steele & Co. were secured by mortgage on Republic county, Kansas, lands which had been attached prior to the assignment. None of the claims against Davis, Steele & Company are included in the indebtedness of the D. M. Steele Mercantile Company.

"At the time of the trial the mercantile company owed about $70,000, a part of which is in the original notes, and a part in renewals and money borrowed to pay off others. Its entire property was worth $80,000 or $90,000, making the entire one thousand shares of capital stock worth from $10,000 to $20,000; or the shares now in litigation in round numbers from $8,000 to $16,000. . . . . . . . .

"Five or six years before the trial Mr. D. M. Steele organized the Steele-Smith Grocery Company in Omaha, Nebraska, and gave the plaintiff, John Steele, $25,000 of its stock, which was then fairly and fully paid up in money and property, and made him an officer of the company and placed him in an active position in connection with its operation.

"Mr. Steele also, after his failure and before his death, transferred to the defendant, A. B. Weakley, as trustee for plaintiff Webb Steele, an insurance policy on his own life for

$10,000 issued in 1875, on which the premiums paid had amounted to more than the sum insured. This was collected by Weakley, who loaned it to the mercantile company to assist in paying its debts.

"The capital stock of the Dudley M. Steele Mercantile Co. consisted of one thousand shares of the par value of one hundred dollars each, paid by the transfer of the assigned property and composition of the debts of Steele and Steele & Walker and the Midland Coffee & Spice Company. It was distributed as follows: Each of the six directors held one share to qualify him, Judge Lazarus held two hundred shares and the remaining seven hundred and ninety-four shares are the ones in controversy. They were issued under the following circumstances: On the 18th day of December, 1894, when the corporation was organized, Mr. Jessopp, the secretary, made out the certificate of this stock to Mr. Steele and placed it all in his desk for signature. Mr. Steele signed all the rest, but stated to Mr. Jessopp that he did not wish this certificate made out that way, and that he would instruct him later. In the following August (1895) Mr. Jessopp was going east, and not wishing to leave the office without having the stock certificate made out properly, he went to Mr. Steele and asked him how he wished it to be made out. Mr. Steele directed him to make it out to Mrs. Weakley, and to date it December 18, which he did, and signed it, and Mr. Steele signed it and took it. Just before Mr. Steele's death, and apparently because it was expected, Mrs. Weakley transferred the certificate to her husband, who afterwards became president of, and generally controlled and managed the business of the corporation. He disclaims any interest except as the representative of his wife."

The values of the property of the corporation from which the estimate of the value of the stock as above stated is made, are not based on estimates that profess to be very accurate, and the counsel for respondent argue that they

are much underrated; but such as it is, it is the best evidence there is in the case on that point, and considering that the value must at last depend upon the successful handling of the assets of the corporation, and the fluctuations of the markets until its affairs are wound up, it will not be unreasonable to respondents if we, for the present, consider the stock in question worth $16,000. The homestead which is covered by the mortgage given by Mrs. Weakley and Mrs. Pitts is estimated to be worth $12,000 and the evidence shows that there is probability of its being sold under the mortgage and lost to the mortgagors.

It also appears that after her marriage Mrs. Weakley and her husband lived in her father's family, and after the death of her mother, which occurred about two years before the death of her father, she took charge of the household for her father and managed it; she nursed her father in his last illness, and was with him when he died. Plaintiff John Steele was the oldest child, a son of Mr. Steele's first wife. Mrs. Weakley, Mrs. Pitts and Webb Steele are children of his second wife. Mr. Steele was a kind and affectionate father, and there is no evidence to show any special preference in that respect for any one of his children; but Mrs. Weakley was the oldest daughter and lived with him, and her husband possessed also his confidence, as shown by his making him trustee for his youngest son, his consulting with him in the management of the liquidating corporation, and suggesting him as its manager. After the death of Mr. Steele, Weakley was elected president of the corporation, at a salary of $2,500 a year, which position he held up to the date of the trial. It was doubtless by means of this stock that he became president of the corporation, yet the power to vote the stock was not in him, but in the committee of the creditors.

The testimony adduced on the part of plaintiffs to sustain the alleged trust is as follows:

Mrs. Pitts, one of the plaintiffs, testified as follows:

"Q.   Did you have any conversation with your sister, Mrs. A. B. Weakley, after your father's death, in reference to the stock which she received from your father?   A. Yes.

"Q.   Where did that conversation take place?   A.   It occurred down at my house, in my bed room.

"Q.   Who was present at that conversation?   A.   No one but Mrs. Weakley and myself.

"Q.   Tell the court, in your own way, just what she said to you, and what occurred at that time.   A.   She came down and told me she wanted to tell me in regard to the stock.   She said that papa had had her in the room and given it to her, and told her that it was the Dudley M. Steele Mercantile stock, and that it had been put in her name for business reasons, and that it was for Webb and herself and me, and she was to hold it for us.

"The court:   For whom?   A.   For Webb and herself and for me.

"Q.   Was that all, or in substance all, that she said in that conversation?   A.   Yes; that was about all.   She said a good deal more, but that ——

"Q.   Did you—in any conversation with her, was there anything said why she had transferred this stock to her husband?   A.   Well, she told me at one time that Mr. Weakley owed a good deal of money to Mr. Tootle, and it was at Mr. Tootle's suggestion that the stock had been transferred to her husband.

"Q.   Did you ever have any conversation with Mr. A. B. Weakley as to how he held the stock?   A.   No, never.

"The Court:   How long after your father's death was it that you had this conversation with Mrs. Weakley?   A. The Saturday morning after father was buried."

Cross Examination, by Mr. Brown.

"Q. She said that her father had given her the stock, when did she say he had done it? A. I can not remember just when she said that that transpired. She said that he called her in and gave her the stock, and said it was to be held for Webb and herself and for me, and that for business reasons it had been put in her name.......

"Q. You say Mrs. Weakley came to your house the Saturday after your father died? A. Yes, Saturday morning.

"Q. And said that she held this stock for you and Webb as well as for herself? A. She did. .......

"Q. Did Mrs. Weakley ever tell you, or say in your presence, at the house where your father died, that she transferred the stock to Mr. Weakley so he could control it and take the place of your father until the debts were paid? A. She told me that in the house, after papa died."

Mrs. Johanna S. Rogers, testified:

Q. You are the sister of the late Dudley M. Steele, I believe? A. Yes, sir.

"Q. Where were you residing at the time of your brother's death? A. I was in his home.......

"Q. Did you hear any conversation between Dr. Pitts and Mrs. Weakley? A. I did.

"Q. State what, if anything, Mrs. Weakley said, in that conversation, in reference to how she held this stock, if you remember? A. Well, she stated that—she was standing over the register, and Dr. Pitts asked her how the stock was—he said: 'Did you state that your father gave you that stock for the benefit of the children? And she said, 'yes, I do.' And then, they were under great excitement, and she turned and said, 'I won't talk any more.' And she went up and telephoned for Beattie, her husband.......

"Q. You remember of testifying with reference to this

interview, over at the directors' room of the First National Bank, don't you?   A.   Yes, sir.

"Q.   You said you did not hear the conversation between Mr. Pitts and Mrs. Weakley very well, at that time? A.   Oh, yes, I did; I heard Dr. Pitts and Mrs. Weakley. The question was asked me, did I hear Mrs. Pitts and Mrs. Weakley?   I heard no conversation between them.

"Q.   I will read from your testimony:   'I remember Dr. Pitts asked her a question in reference to the stock; I remember that distinctly, because she was standing over the register, warming her feet, and he asked her whom this stock was intended for, or some such question; and her reply was that her father gave it to her for the benefit of Webb and Edna, as well as herself.   There was something said—I couldn't relate all the conversation, but that was the real point, and the stock was the subject of the conversation.' You simply heard that remark?   A.   That is all correct that you have read.

"Q.   Did you take any part in that conversation?   A. None whatever; I left the room in the course of a short time.

"Q.   Dr. Pitts wrote it out, did he not?   A.   No, sir. I wrote it out; that was before I left the room.   I was seated in a chair, and when Mrs. Weakley made the statement, the Doctor remarked to me, 'You heard that, Mrs. Rogers?'   I said, 'Certainly I heard it.'   He says, 'You put it down,' and handed me pencil and paper, and I wrote it down.

"Q.   And you signed your name to it?   A.   I guess I did.

"Q.   What did you do with that paper?   A.   I don't know; I never attached any importance to it; I didn't have it.   I don't know much about law; I didn't think about it, and I don't know who has it; it was brought forth there in the room, and I testified to my signature, which I would do again.

"Q.   Did you ever give it to anybody?   A.   No, sir.

"Q.   You say it didn't occur to you as being important? A.   Dr. Pitts handed me a paper and pencil, and asked me to write it down, and I wrote it and he took it, and I have never seen it."

J. M. Johnson testified:

"Q.   You reside here in St. Joseph?   A.   I do.

"Q.   And your occupation is what?   A.   Practicing law.

"Q.   Are you acquainted with Mr. A. B. Weakley, one of the defendants in this case?   A.   I am.

"Q.   Did you, at a certain time, have a conversation with him, in the presence of Mrs. Weakley, his wife, in reference to the stock, which it is here alleged that she held as trustee?   A.   I had several conversations with Mr. Weakley on that subject, one of which I am quite sure was in the presence of his wife, in the probate court room.

"Q.   Could you tell about when that was?   A.   Well, it was within a couple of months after the death of Mr. Steele. . . . . . . .

"Mr. Brown:   What did you mean by 'presumed she could have heard;' what were the positions of the parties? A.   I should say the positions were about as they are sitting at the counsel table there; Mrs. Weakley was close to her husband, within two or three feet of him.

"Q.   That was in the probate court room?   A.   Yes, sir.

"Mr. Boyd:   State the conversation, please.   A.   It has been some time ago—that conversation.   As near as I can remember it, I had had several with Mr. Weakley before on that same subject, and I think I referred to the manner in which Mrs. Weakley held this stock, and intimated to Mr. Weakley that she was holding it as trustee for herself and these children.   Mr. Weakley said that that was not true; that she was not holding it as trustee, but that it was the

understanding, when the stock was given to her by Mr. Steele, that it was to be for her and the other children of Mr. Steele, and that Mrs. Weakley would do what was right about it. Now, I will not undertake to state, at this time, what that exact conversation was; but that, according to my recollection, was the substance of it, and was in line with other conversations I had had with Mr. Weakley before.

"Mr. Boyd: State fully what was said about it having been handed or passed to her to hold for her and her brothers and sisters? A. Well, all that was said about that was just as I have stated: that when the stock was put in her name by Mr. Steele it was for the benefit of her and the other children, and that she would do what was right about it. Mr. Weakley was really resisting the appointment of an administrator, in the probate court, and that was what I was there for, and he didn't think any administration was necessary, and said that Mrs. Weakley would do what was right about the stock when the time came."

Cross Examination, by Mr. Brown.

"Q. What did you mean by 'intimating to him that she held it in trust?' A. Well, I stated to him that Mrs. Weakley was holding it in trust and asked him why they were resisting the appointment of an administrator, and why she didn't make the division of it; and he said she didn't hold it in trust, that she was not a trustee, and then went ahead and stated what the understanding was when the stock was turned over to her.

"Q. Did he say that he was present when the stock was turned over to her? A. No, I don't remember that he said that.

"Q. Did he state that he ever heard Mr. Steele say anything about it? A. No, he didn't state that; he just stated that this was his understanding. He didn't say the source from which he derived his information . . . . . . .

"Mr. Brown: How long a conversation was this? A. Oh, it was short; two or three minutes; just two or three questions that I asked him in the presence of his wife. My purpose in asking it was to get some statement from him in her presence as to how she held the stock.

"Q. Whom were you acting for there? A. I was acting for Mrs. Pitts and Dr. Pitts. I was their attorney.

"Q. And it was your object there to get him to make some statement in the presence of his wife that would bind her? A. Yes, sir; I had that in mind.

"Q. And that was what the conversation was for, that is what you began it for? A. Yes. Well, I don't know that I began it for that, but I certainly had that in mind when I asked those questions.

"Q. Did he say how it was to inure to the benefit of the children? A. No, he was very vague on that part of it. In other conversations —

"The Court: Just state what took place at this conversation.

"Mr. Brown: What do you mean by saying that he was vague on that question?

"A. All he said was that the stock had been put in Mrs. Weakley's name for the use and benefit of the children of Mr. Steele, and that she would do what was right about it. Of course, I wanted her to make a distribution, and they wouldn't agree to that."

Charles B. Keller testified:

"Q. State your name, age, residence and profession or occupation? A. Charles B. Keller; age, 37; residence, Omaha, Nebraska; attorney-at-law.

"Q. How long have you been practicing law? A. About fifteen years.

"Q. Were you ever, as an attorney-at-law, connected with the business of Steele & Walker, a mercantile firm,

in which Mr. Steele had an interest, in Omaha? A. I was attorney for the Steele-Smith Grocery Company here, in which Mr. Steele was interested for a great many years, but I never had any professional connection with the business of Steele & Walker, of St. Joseph.

"Q. Do you know Susan H. Weakley, the wife of A. B. Weakley? A. Yes, sir.

"Q. Did you have any conversation with her in St. Joseph in reference to certain stock which her father delivered to her? A. Yes, sir; I had a conversation with her in St. Joseph upon that subject, after Mr. Steele's death. .

"Q. Can you state about the time? A. No, I can not say just what time it was; it was, I think, within six months after Mr. Steele's death; it was certainly within that time, and probably three or four months after his death; I do not remember the exact time.

"Q. State what, if anything she said in that conversation in reference to the disposition that was to be made of that stock. State all that she said in that conversation? A. She did not say anything about any disposition being made of the stock, as I remember it; the conversation that she had with me, or that I had with her, rather, was simply as to the circumstances under which the stock was delivered to her.

"Q. State what she said in that regard at that time? A. It was also in reference to an arrangement of the matter with Dr. Pitts and his wife; in that conversation she said to me that Mr. Steele called her down from her room, as I recollect it, and handed her the certificate for the shares in . the D. M. Steele Mercantile Company, and said to her: 'Susie, or Susan, take this and keep it; that is all I have on earth.' She said in that conversation, that if I could see the attorney for Mrs. Pitts, and make an arrangement whereby what she would have been entitled to as one of the children of her father, if no disposition had been made of this

stock whatever—so that the stock could be placed in the
hands of some third party as trustee for Mrs. Pitts, that
she was willing to have that done, but that she was not willing
that the stock should be placed in such a way that Dr. Pitts
could ever get his hands on it; that she knew that her father
never would have sanctioned any other arrangement than
that; that he had so expressed himself to her in his lifetime.
That was substantially all the conversation I had with her; I
then left her and went to see Mr. Johnson, who represented
Dr. Pitts, and talked with him about the matter."

### Cross Examination.

"Q. During that conversation, Mrs. Weakley did not
say anything to you to indicate that Mr. Steele had directed
any disposition of that stock, more than the disposition which
he had made by delivering it to her, did she? A. No, she
did not.

"Q. She stated during that conversation many times,
did she, that she would be willing to give to Edna, or to
Mrs. Pitts, the share that Mrs. Pitts would have been entitled
to as an heir of Mr. Steele, if no disposition had been made
of it? A. No; she didn't state that many times; she said,
however, that she was willing to do that, and put into the
hands of some third party as trustee such share, if it could be
arranged so that Dr. Pitts could not get his hands on it.

"Q. There was a great deal of trouble about the matter,
wasn't there? A. Yes, sir; there was.

"Q. Things had grown pretty warm? A. There was
a great deal of feeling between the parties.

"Q. She showed a disposition to get rid of it, didn't
she? A. Yes, sir; she so expressed herself; I remember
she said she did not think her father thought any more of her
than of the rest of the children, and she wanted to get the
matter adjusted. . . . . . . . .

"Q. But the principal thing that she seemed to want,

or that you gathered from her conversation that she wanted was to get rid of the matter? A. That is right.

"Q. To get rid of the family row? A. That was the thing.

"Q. And you say there was nothing said by her that indicated that her father had directly or indirectly given her any instructions with reference to the disposition of the stock? A. No; except that she did say that she knew when she made the statement that she was willing to place Edna's share in the hands of some third party in trust, she said that she knew that that would be according to her father's wishes.

"Q. She said at that time that she knew that her father did not want Dr. Pitts to have it, didn't she? A. That is right; or to get hold of it.

"Q. But she did not say anything to indicate that her father ever made any remark about Dr. Pitts in connection with this stock, did she? A. No further than that she knew her father had expressed the wish, or rather the purpose, that Dr. Pitts should never get hold of any of his property.

"Q. That is, that he had expressed that as his own purpose? A. Yes, sir; that is what the conversation was."

Redirect Examination, by Mr. Ryan.

"Q. What did she say, if anything, in that conversation about Mrs. Pitts and his children being entitled to their share and interest in that stock? A. Well, I don't recollect that she said anything of that kind; I do not know anything about that one way or the other.

"Q. She stated to you that she wanted you to go to the attorney for Mrs. Pitts, Mr. Johnson, so that arrangements might be made to ascertain what her share was, and to put it in the hands of a trustee for Mrs. Pitts? A. Not to ascertain what her share was, but to place it in the hands of

some third party in trust for Mrs. Pitts—what she would be entitled to as an heir of Mr. Steele.

"Q.   What, if anything, did she say about what the other children would be entitled to?   A.   I don't recollect that there was anything said about that.   The controversy was between Mrs. Pitts and her husband, on the one hand, and Mr. and Mrs. Weakley."

Recross Examination, by Mr. Brown.

"Q.   You had suggested that sort of a solution of the matter yourself, hadn't you?   A.   I think I had.   My recollection is that after this controversy arose between them, John Steele came to me, and we went down to St. Joseph to see if some adjustment of the difficulties between Mrs. Pitts and her husband and Mrs. Weakley and her husband could not be accomplished.

"Q.   And this solution of the matter was suggested to Mrs. Weakley, wasn't it?   A.   Well, it was discussed in that meeting.

"Q.   But did she originally suggest it?   A.   No, I don't think she did.

"Q.   It was suggested to her, and she was willing to do it?   A.   I think she said that she was willing that Edna should have her share, but she was not willing that it should be placed so that Dr. Pitts could get his hands on it.

"Q.   Did she state what she meant by 'her share?'   A.   No, she did not state that; that is my recollection of it.

"Q.   And nothing in the world was said about any suggestion or statement or direction of Mr. Steele's with reference to this stock—nothing of that sort was said by Mrs. Weakley was it?   A.   No, I don't think there was anything of that kind said."

John Steele, one of the plaintiffs, testified:

"Q.   Mr. Steele, state your name and age.   A.   J. M. Steele; 36 years old.

"Q.  What relation, if any, were you to Dudley M. Steele?  A.  He was my father.

"Q.  Did you have any conversation with Mrs. Weakley, your sister, after the death of your father, in reference to the manner in which she held that stock?  A.  Yes, sir; I had a conversation with her.

"Q.  About how long was that after your father's death?  A.  Well, it was probably three or four months.

"Q.  Where did that conversation take place?  A.  Up at the house.

"Q.  At her house?  A.  Yes, sir.

"Q.  How did you happen to go to her house—for what purpose?  A.  I came down to see about what she intended to do in regard to the stock.

"Q.  In regard to the stock of the mercantile company?  A.  Yes, sir.

"Q.  Now, tell the court what you said to her, and what she said in reply.  A.  Well, I asked her, I says, 'What are you going to do about this stock—what distribution?'  She said, 'Well, Jack, I propose to do what is right in the matter.  I am going to follow out my father's wishes.'  I says, 'Well, that is all right.'  She said, 'I fully intend to do what is right in the matter.'  And she further stated that she was going to place the stock in such a way for Edna that Dr. Pitts could not receive any of it.

"Q.  That is, she was going to place Edna's shares so that Dr. Pitts could not control them?  A.  Yes, sir.

"Q.  What did she say, if anything, about how she would divide the stock?

"Mr. Brown:  We object, on the ground that it is incompetent, irrelevant and immaterial, as to what she said about what she would do.  We are not objecting to anything that she said her father said to her, but anything that she conceived after her father's death can not be evidence in this case.

"The Court: Of course, what she intended to do would not be of any importance unless they followed it up and connected it with other testimony.

"Mr. Ryan: We want to show her declarations with regard to this property. The question is as to how she held it.

"The Court: Well, I will let him answer the question."

To which the defendants duly excepted.

"Mr. Ryan: What did she say, now, in reference to how she intended to divide that property according to her father's wishes?

"Mr. Brown: We object to leading questions.

"The Court: The objection is sustained, as leading.

"Mr. Ryan: State what she said in reference to the division of that property, if she said anything, in accordance with her father's wishes and directions.

"Mr. Brown: We object to that. What she said is what is important, and they have no right to undertake to make out a case by Mr. Ryan's statement that it was made according to her father's wishes and directions.

"The Court: This is one of the plaintiffs, isn't it?

"Mr. Brown: Yes, sir.

"The Court: The objection will be sustained.

"Mr. Ryan: If your Honor will listen to the question, my question is: State what, if anything, Mrs. Weakley said about the division of that property as directed by her father.

"Mr. Brown: We object. I will state right now that if Mr. Ryan desires to ask what her father told her we have no objection to that.

"Mr. Ryan: I want to know what she said, if anything, as to the division of that property as directed by her father.

"The Court: Answer the question."

To which ruling defendants excepted.

"The witness: She said that she was going to do what was right in the matter, and always intended to do so, and she intended to follow out my father's wishes, and what his wishes were, that each one was to get their share. . . . . . . .

"Q. Did Mrs. Weakley, at either time you were here, at any time you talked with her, ever say anything that her father told her about this stock? A Why, she told me, when I came down—I asked her what she was going to do about the stock —

"Q. I am asking if she told you any remark that her father made about it? . A. She said she was going to follow his wishes.

"Q. Did she ever repeat to you any remark that her father had made about the stock? A. Yes, she said that her father had placed the stock in her hands, and said that this was all he had in the world.

"Q. Did she say anything more that her father said? Did she repeat any other remark that her father had made to her? A. No, I don't know that she did; I don't remember. . . . . . . .

"Q. Didn't she ever say anything about her duty to pay her father's debts? A Why, she may have said something of that kind—yes, sir; she said the debts had to be paid, I believe, or something of that kind. . . . . . . .

"Q. Can you state whether or not she has said to you that she intended to see that these debts were paid out of this property? A. She said the debts would have to be paid out of the property; yes, sir.

"Q. You have not kept much track of this business, have you? A. No, sir; not down here, I have not.

"Q. But you say that Mrs. Weakley did say that she did not intend to let Mrs. Pitts have anything in such shape that the doctor could ever get hold of it, didn't you? A. Yes, sir.

"Q. Did she say that she knew that to be her father's

wish? A. Well, no; she didn't say that to be her father's wish.

'Q. Did she give any explanation of it, at all? A. No, sir; I didn't ask her in regard to it.

"Q. She didn't say then, that that was a necessary measure for the protection of this property, so that Mr. Steele's debts could be paid with it? Didn't she tell you that? A. Why, she said when everything was settled she intended to do what was right to carry out her father's wishes.

"The Court: Was that all she said? A. That is about all. Of course, the other conversation I don't remember; but I mean in regard to the business; that is what I came down to see about; whether she intended to divide up the property or not.

"Mr. Brown: That is, if she intended to divide it up right then? A. No, sir; I didn't say that.

"Q. And she said when everything was settled she intended to carry out her father's wishes? A. I don't know whether she said when everything was settled.

"Q. You used those words just now? A. She remarked that the debts had not been paid yet.

"Q. What did you mean a minute ago, when you said that she said when everything was settled she intended to carry out her father's wishes? Were you mistaken when you said that? A. When everything was settled—when everything was paid—she would make the division.

"Q. That was what she said, was it? A. That might possibly have been what she said; that is probably what she meant.

"Q. I am asking you what she said. You said that she said that when everything was settled she would carry out her father's wishes. A. No, she first answered me, when I asked the question, that she was going to do what

was right in the matter, and she said that she was going to carry out my father's wishes. .

"Q. You said just a minute ago, that she said when everything was settled she was going to carry out her father's wishes. Now, were you not mistaken when you said that? A. That was the first conversation I had, when I asked her about dividing the stock.

"Q. Well, did she say that? A. She probably said afterwards that the estate had not been settled up, and the debts had to be paid off.

"Q. Did she say that when it was settled, she was going to carry out her father's wishes? A. No, sir; she didn't say that the second time; she told me that before.

"Q. That when it was settled she intended to —

"A. To divide up.

"Q. What did she mean by 'when everything was settled?' A. I suppose when everything was paid off.

"Q. That is when her father's debts were all paid out of this property? A. Yes, sir.

"Q. That is what she meant was it? A. That was what I understood her to mean.

"Mr. Brown: That was what she said? A. That was what I understood her to mean.

"Q. And it was what you understood her to say, also? A. Yes, sir."

Hon. W. P. Hall, a witness for plaintiff, testified that he was attorney for the plaintiff in a suit of Lazarus v. D. M. Steele Mercantile Co., in the United States circuit court, for that district, in the prosecution of which he took the deposition of defendant, Mrs. Weakley, touching the subject as to how she held the stock now in question, and that in that deposition "the whole question was thoroughly examined and investigated." The witness was then asked to state what Mrs. Weakley testified to in the deposition, but when the objection was made that the deposition itself was the best evi-

dence the court sustained the objection and the plaintiffs declined to introduce the deposition.

The above is all the evidence in the case on which the circuit court based its decree declaring that the stock had been given to Mrs. Weakley in trust, and defining the nature and extent of the trust, the beneficiaries thereof, and the share of each.

Mrs. Weakley, as witness for defendants, denied that she had made the statements attributed to her by the witnesses, or that she had heard the conversation between her husband and Keller that the latter testified to. She was asked if her father gave her any indication of the manner in which she was to hold the stock, but on objection of plaintiff it was ruled that she was incompetent to speak on that subject.

I.   When a court of equity is asked to interpose in a matter of this kind to so change the phase of a transaction as to give it a different legal effect from that it would have if left as the parties themselves left it, it acts with great caution.   The power which courts of equity have assumed to exercise in this respect would never have been acquiesced in by a people who require a government by law rather than by the arbitrary will or caprice of a chancellor, if the power had not been always exercised with wisdom and great caution.   It is generally safer to leave a matter as the parties left it than to attempt to change it, unless the court is sure that it is right to make the change.

In the case of an express trust in real estate, the burden of the chancellor is relieved, and at the same time his power curtailed by the provisions of the statute of frauds which requires that it be "manifested and proved by some writing signed by the party," etc., but in cases of resulting trusts in lands, and trusts of either kind in personalty, the statute of frauds gives no assistance, and the way is open to establish the trust by oral proof.   When the case is covered by the

statute of frauds, and the evidence is in writing, the court determines from a construction of the documents whether or not the trust exists, and if so, its limits; but when the statute does not govern, and the evidence is oral, the court must find from that means whether or not there is a trust, and if so, its limits. In the two cases the nature of the evidence in the one is different from that in the other, but the nature of the facts to be proven are alike in both. The establishment of a trust by means of oral testimony may be more difficult than by writing, but when established its lines must be just as definite and clear in the one case as the other.

It not unfrequently appears that the act of a person who has since died would be very much more natural and in accordance with what it may be supposed would have best suited him to direct, if certain omitted details were supplied, but if those details change the nature of the act the court has no more power to add them than it has to add to one's will or make a contract for parties. A court of equity is purely judicial, it is not arbitrative, it is not paternal.

In a recent case (In re Estate of Soulard, 141 Mo. loc. cit. 659), this court, per MACFARLANE, J., said: "An imperfect gift will not be converted into a declaration of trust on account of the imperfection. There must therefore have been an intention to create a trust before one can be declared and enforced. This principle is well expressed by RAPALLO, J., in Young v. Young, 80 N. Y. 437, who says: 'It is well settled that equity will not interpose to perfect a defective gift or voluntary settlement made without consideration. If legally made, it will be upheld, but it must stand as made, or not at all. When, therefore, it is found that the gift, which the deceased attempted to make, failed to take effect, for want of delivery or a sufficient transfer, and it is sought to supply this defect and carry out the intent of the donor by declaring a trust which he did not himself

declare, we are encountered by the rule above referred to. It is established as unquestionable law that a court of equity can not by its authority render that gift perfect which the donor has left imperfect, and can not convert an imperfect gift into a declaration of trust, merely on account of that imperfection.' "

And also: "A voluntary trust must be created by the donor himself, and not by the court." And again in the same case: "Three things, it has been said, must concur to raise a trust: 'Sufficient words to create it, a definite subject, and a definite object; and to these requisites may be added another, viz., that the terms of the trust should be sufficiently declared. Bispham's Eq. 65." See, also, Knapp v. Pub. Knapp & Co., 127 Mo. 53.

To justify the decree that was rendered in this case, we must find from the evidence that the father of these plaintiffs gave this stock to his daughter, Mrs. Weakley, in express trust for the sole purpose to be by her divided equally between his four children. If the evidence should lead us so far as to show that the stock was given to her in trust for some purpose, but leave us in the dark as to that purpose, we must be content to leave it as the donor himself saw fit to leave it. If it be said that resort to inference and even conjecture should be indulged in a case like this, because of the fact that the transaction occurred when no one but the donor and donee were present, and his lips are now sealed in death, the answer is that the time, place and surroundings in which the gift was made were those of the donor's own choosing, he is presumed to have known and desired the consequences that would follow the act under those circumstances, and trusted the result to his daughter, and if his lips are now sealed by death her lips are sealed by law. We must presume that he preferred to leave it in that condition, and the court has no right to alter the condition at the suit of his heirs except on entirely satisfactory proof.

This court has often decided that evidence to support a claim like that of the plaintiffs in this case must not be of a doubtful character. We will refer to only a few of these decisions.

In Johnson v. Quarles, 46 Mo. 423, loc. cit. 426, per BLISS, J., it is said: "The insecurity of titles and the temptation to perjury, among the chief reasons demanding that contracts affecting lands should be made in writing, also imperatively require that trusts arising by operation of law should not be declared upon any doubtful evidence, or even upon a mere preponderance of evidence. There should be no room for a reasonable doubt as to the facts relied upon."

In Ringo v. Richardson, 53 Mo. 385, loc. cit. 394, SHERWOOD, J., quotes from Baker v. Vining, 30 Me. 121: "And so cautious have courts been in reception of such evidence [meaning oral], although the proofs have been allowed to be read, yet if there was any secret in the cause not understood, the relief sought has been denied," and says: "Other authorities hold that the evidence in support of the alleged trust is a dangerous species of evidence, and therefore to avail anything must be clear, strong and unequivocal and leave no room for a reasonable doubt in the mind of the chancellor as to the existence of such a trust. A mere preponderance of evidence will not do in such cases."

In Forrester v. Scoville, 51 Mo. loc. cit. 269, by the same judge, this court said: "Even had the testimony preponderated on the side of the plaintiffs, it would not have been sufficient to have warranted a decree in their favor, unless of a character so clear, and definite and positive, as to leave no room or reasonable ground for hesitancy in the mind of the chancellor, as to the ownership of the money."

In Shaw v. Shaw, 86 Mo. 594, the language is "such evidence must be well nigh conclusive in its character." To the same effect are Adams v. Burns, 96 Mo. 361; Allen v.

Logan, Id. 591; King v. Isley, 116 Mo. 155; Davis v. Scovern 130 Mo. 303.

The decisions from which the above quotations are made were in cases affecting real estate. Whilst legal history shows that the law has been more cautious in matters relating to title to real estate than to personal property, as evidenced by the prescribed forms of conveyancing and the statute of frauds, yet in the particular we are now considering, that is, as to the quality and force of the oral proof that ought to be required when one attempts to fasten on property in the hands of another the character of a trust, the reason, if there is one, for making any difference in the rule applicable to one kind of property and another is not obvious. In both cases the plaintiffs came into a court of equity seeking its aid to overcome the *prima facie* title of their adversary, and appealing to good conscience for the superiority of their claims above the mere legal aspect of the case. Authorities are not so numerous on this point, because not so many such cases have come into the courts affecting only personal property as those affecting real property. In Kramer v. Mc-Caughey, 11 Mo. App. loc. cit. 429, the court per THOMPSON, J. conceding that trusts in personal property might be established by parol, citing Perry on Trusts, sec. 86, said: "But while that is so, it is equally true, as in cases of parol trusts in real estate, where such trusts are possible, that 'the subject-matter of the trust must be clearly ascertained, as well as the purpose of the trust, and the persons who are to take the beneficial interests. Loose, vague, and indefinite expressions are insufficient to create the trust.' "

In Bailey v. Irwin, 72 Ala. loc. cit. 507, the court uses this language: "And if it is intended to fasten a trust upon personal property, created verbally, and dependent merely upon oral testimony, the testimony ought to be clear and explicit."

In Allen v. Withrow, 110 U. S. loc. cit. 129, the court

said: "So far as the personal property conveyed to Withrow is concerned, it must be admitted that a trust may be established by parol evidence; but such evidence must be clear and convincing."

II.   The plaintiffs' testimony tending to establish the trust consists entirely of the statements of witnesses as to admission that Mrs. Weakley is said to have made.   Even in ordinary law suits that is not a high grade of evidence.   Every text writer on the subject treats it rather with toleration than favor.   Greenleaf, says:  "With respect to all verbal admissions, it may be observed they ought to be received with great caution.   The evidence, consisting as it does in the mere repetition of oral statements, is subject to much imperfection and mistake."   [Greenl. on Evid. (15 Ed.), sec. 200.]   A note to that section by Judge REDFIELD, is:  "In a somewhat extended experience of jury trials, we have been compelled to the conclusion that the most unreliable of all evidence is that of the oral admissions of the party, and especially where they purport to have been made during the pendency of the action, or after the parties were in a state of controversy."

"With respect to verbal admissions, it may be observed that they ought to be received with a great deal of caution." [1 Phillips on Evid., *479.]

A part of the plaintiff's evidence on this point consists of the statement of a witness as to what Mrs. Weakley's husband said in her presence, to which she made no reply and therefore to which she is presumed to have assented.   Of such evidence Mr. Greenleaf, says:  "But in regard to admissions inferred from acquiescence in the verbal statements of others, the maxim, *Qui tacet consentire videtur*, is to be applied with careful discrimination.  'Nothing,' it is said, 'can be more dangerous than this kind of evidence.'" [Greenl. on Evid. (15 Ed.), sec. 199.]

III.   Now let us weigh the plaintiff's evidence.   Their

strongest evidence is that of Mrs. Pitts.   She testified that on the next Saturday after her father's death, her sister Mrs. Weakley, came to her home and into her room, and the witness said:   "She came down and told me she wanted to tell me in regard to the stock.   She said that papa had had her in the room and given it to her, and told her it was the Dudley M. Steele Mercantile Stock, and that it had been put in her name for business reasons, and that it was for Webb and herself and me, and she was to hold it for us." ·

Taking the testimony of this witness at its par value, and giving to it all the probative force that can be claimed for it, we see that it includes only three of the children in the ultimate beneficial interest, leaves it unspoken as to the proportion which each is to have, and leaves us entirely in the dark as to the "business reasons" for which also the stock was given to Mrs. Weakley.   According to this witness she did not ask, nor did Mrs. Weakley volunteer to explain or disclose, the business part of the trust to which the stock was to be devoted.   The evidence in the case showed that Mr. Steele in his lifetime was a man of extensive business affairs, and so highly was his ability and integrity appreciated by his creditors, even after his failure and assignments, that in order to avail themselves of his valuable services they created this unique corporation, founded on the assets of the assigned estates and put him at the head of it, with a salary of $5,000 a year, to work out the problem of realizing the most that could be out of the assets for their benefit first, and his in the end.   And he had to a large degree, though not entirely, accomplished that purpose when sickness came and he saw that death was coming.   That he had entire confidence in his son-in-law Weakley, is shown by the fact that when his fortune was crumbling he made him the trustee of the $10,000 policy for the benefit of his youngest son, and also spoke of him as the one to manage the corporation.   The evidence does not show expressly that when Mr. Steele gave the

stock to his daughter he told her that it was for the purpose of having her husband take his place when he was dead, as the president and manager of the corporation, but all the circumstances point with great force in that direction.

And if Mrs. Weakley delayed division of the stock and assigned it to her husband for that purpose, there is nothing in the evidence to justify the conclusion that that is not the purpose for which her father gave it to her. Whether or not that was her purpose, or whatever her purpose was, the court at the instance of the plaintiffs, refused to allow her to testify. But that evidence does show that whatever ultimate interest the children were to have there was primarily this business reason which was the cause of the gift to the daughter, and it is fatal to the plaintiff's case that the court is left in the dark on that point. In the language of Baker v. Vining, *supra*, cited in Ringo v. Richardson, *supra*, "if there was any secret in the cause not understoood, the relief sought has been denied."

According to Mrs. Pitts, Mrs. Weakley did not delay in making known to her that she was to have an interest in the stock, nor was that information coerced from her, but was, as might be expected from one sister to another. And here it might be well to say that there is nothing in this record to indicate that Mrs. Weakley intended to make any other disposition of the stock than as Mrs. Pitts indicated she was obligated to do.

The rest of the plaintiff's testimony does not make as favorable an impression as that of Mrs. Pitts. The interview with Mrs. Pitts was of Mrs. Weakley's own seeking, and altogether becoming. But the conversations after that indicate that the parties were laying traps for Mrs. Weakley to betray her into expressions upon which a lawsuit could be founded. The conversation testified to by Mrs. Rogers was of that kind; from her testimony it would seem that Dr. Pitts was plying Mrs. Weakley with questions, and they were

under such excitement that Mrs. Weakley had to telephone to her husband to come to her relief, and Dr. Pitts called on Mrs. Rogers to write down what she had heard Mrs. Weakley say, which the witness did, the substance of which was that she said her father gave her the stock for the benefit of Webb and Edna as well as herself. The comptency of that evidence is at least questionable. A party may admit a fact, but not a legal conclusion. [Phillips on Evid. *452.] Whether or not a parol trust was created by Mrs. Weakley's father for the benefit of some or all of his children, depends upon what he said at the time he gave the stock, and this witness does not undertake to say that Mrs. Weakley said anything as to what her father said, it only purports to be her conclusion. But even if it is competent it is so vague and indefinite that it weighs as nothing.

The only one of the plaintiffs' witnesses who testifies as to what Mrs. Weakley said her father said when he gave her the stock is Mr. Keller, the Omaha attorney. His testimony was that she said her father called her down from her room and handed her the certificates, and said to her, "Susie, or Susan, take this and keep it, it is all that I have on earth." And so far as this record discloses, that is all that Mr. Steele said when he gave this stock to his daughter. That witness also testified that in that conversation Mrs. Weakley said that if an arrangement could be made whereby whatever share Mrs. Pitts would have been entitled to as one of her father's children if no disposition had been made of the stock whatever, could be placed in the hands of a trustee for her use, so that Dr. Pitts could not get his hands on it, she would turn such share over to such trustee, and she said she knew that her father would never have sanctioned any other arrangement. The witness said he went to Dr. Pitts's attorney and talked with him about it. So far as this record shows, if that plan was not carried out it was not the fault of Mrs. Weakley.

The substance of Mr. Johnson's testimony was that he was attorney for Dr. Pitts, and as such he took occasion to so direct a conversation he had with Mrs. Weakley's husband as to get him to make some statement in her presence as to how she held the stock, and that he succeeded in getting him to say that his understanding was that she was holding it as trustee for herself and the other children. That statement being merely a conclusion was clearly incompetent. Even if the statement had been otherwise legal evidence it would have been entitled to little consideration. We have seen what the law writers say of that kind of evidence when applied even to parties dealing with each other at arm's length, but what would be thought of a rule of evidence that allowed a wife to be caught in a trap because she did not interpose in a conversation between her husband and another man and say that what her husband said was not the truth?

The only other witness who undertook to testify as to admissions of Mrs. Weakley was John Steele, one of the plaintiffs. His testimony was only to the effect that she said that she was going to do what was right in the matter, and carry out her father's wishes, and that she was going to place the stock for Edna in such a way that Dr. Pitts could not receive any of it. The witness under the influence of a leading question put his evidence in this form: "She said that she was going to do what was right in the matter and always intended to do so, and she intended to carry out my father's wishes, and what his wishes were, that each one was to get their share." The latter part of the sentence is sufficiently ambiguous to allow of the construction that Mrs. Weakley said that her father's wish was that each one should have his share but the witness would not venture to say that in unequivocal words, and when pressed on cross-examination he said that the only thing she said as to what her father said when he gave her the stock was that it was all that he had in the world.

It is only upon such vague, equivocal and shadowy testimony that the plaintiffs ask the court to establish a trust, name its beneficiaries and define its limits. We would have to overthrow all precedents and disregard all rules of evidence to do so. This we could not do even if there was an apparent hardship in the case demanding it, but there is none such.

The father of these plaintiffs but a few years prior to these events had given his son John a capital of $25,000 and established him in business, and later when misfortunes began to gather he made provision for his youngest son by transferring to his son-in-law Weakley in trust the $10,000 life insurance for him, and the only children for whom there was no provision were his two daughters; if he designed the whole of this stock for them they would each have less than either of the other children. He was a man of business experience; such men do not rest alone on the chance events of a day but form plans and work towards their accomplishment. When Mr. Steele saw that death would reach him before the corporation he was managing had accomplished the purpose for which it was created, before the debts that still hung over his name had all been discharged, and the full value of the stock realized, he made a disposition of the stock as seemed best to him. One of the features of that disposition which he saw fit to make was to leave its execution entirely to his daughter and to disclose to no one but her its purposes. He had a right to do that and to take the risk of her fidelity in the execution of the trust, if trust there was, and these plaintiffs, as heirs, have no right to complain of what their father did with his own. What the terms of the trust were, if there was a trust, are known only to Mrs. Weakley and the plaintiffs themselves would not allow her on the trial to disclose them. They have her deposition on the subject in which Judge Hall says she was exhaustively examined, and which they thought sufficiently trustworthy to

offer second hand proof of its contents. We find nothing in this record that justifies an apprehension that she will betray any part of the trust, if there was a trust, confided to her.

The judgment is reversed and the cause remanded to the circuit court with directions to enter judgment for defendants dismissing plaintiffs' bill.

All concur, except *Robinson, J.,* absent.