PAULINE FERGUSON, Appellant, v. W. M. ROBINSON.

In Banc, May 20, 1914.

1. **TRUSTS: Constructive: Agreements to Discourage Bidding at Execution Sale.** Equity will not assist one to save his property from appropriation to the just claims of his debtors, as, for example, by agreements to discourage bidding at execution sales.

2. ————: **Express: Statute of Uses.** All express trusts in lands must be manifested and proved by some writing signed by the party who is, or shall be, by law, enabled to declare such trusts. [R. S. 1909, sec. 2868.]

3. ————: **Resulting.** Generally speaking, a resulting trust is one which the law implies to meet the requirement of justice that a legal status be given to what is the clear intention of the parties.

4. ————: **Constructive: Definition: Fraud.** Constructive trusts rest upon the sound public policy which requires that the laws themselves should not become the instruments of designing persons to be used for the purposes of fraud and oppression; fraud is their very foundation.

5. ————: ————: ————: ————: **Not Mere Violation of Parol Contract.** Where transactions have been tainted with bad faith, there is a trust by operation of law; but the simple violation of a parol contract does not constitute such a breach of faith. It is not sufficient to call the transaction a fraud or a trust; there must be some artifice or trick employed to make it so, and a confidence reposed by one party in another on the faith of which something has been lost on one side and gained on the other. Where a trust of this kind is sought to be enforced, fraud must be distinctly alleged and clearly proved.

6. ————: ————: **Evidence to Establish.** Parol testimony, to establish a constructive trust, must be clear, cogent and fully satisfying the chancellor. There should be no room for reasonable doubt as to the facts relied on.

7. ————: ————: ————: **Creation, Terms and Limits.** To establish a constructive trust by parol testimony, the creation of the trust, its terms and its limits must be shown.

258 Mo.—8

8. ——: ——: ——: ——: **This Case.** Evidence *held* not sufficient to establish, for the benefit of the execution debtor, a constructive trust against the purchaser of property at execution sale.

9. ——: **Evidence: Oral Admissions.** Evidence of oral admissions should be received with great caution; consisting as it does of the mere repetition of oral statements, it is subject to much imperfection and mistake.

Appeal from Jasper Circuit Court.—*Hon. David E. Blair,* Judge.

AFFIRMED.

*J. J. Nelson, R. M. Sheppard, Norman A. Cox, Howard Gray* and *Hugh Dabbs* for appellants.

(1)    Defendant, Robinson, agreed with Parker, before, and at the execution sale at Joplin, in October, 1908, that he would bid in the property for Parker, and allow him to redeem the same on repaying the amount required to purchase the same, his expenses, and a reasonable compensation for his time and trouble. Relying on this, Parker was induced to, and did, request Ashcraft, and other responsible bidders who attended the sale to bid on the property, not to bid, because Robinson was bidding it in for him. Robinson, himself, stated to Sharp who was a bidder, on the morning of the sale, that he was purchasing the property for Parker. By reason of this, and because of the impression created among the bidders that Robinson was buying the property for Parker the debtor, Robinson was enabled to, and did, purchase at this sale all of Parker's equity and interest in this property, which interest was of the value of $75,000, at a great sacrifice to Parker, and for less than four per cent of its actual value. Under these circumstances, it is inequitable, and unjust for Robinson to retain the property, and a court of equity will grant relief, and convert the purchaser into a trustee for the

benefit of the debtor. Such a transaction does not come within the statute of frauds. Rose v. Bates, 12 Mo. 30; McNew v. Booth, 42 Mo. 189; Phillips v. Hardenburg, 181 Mo. 474; Slowey v. McMurray, 27 Mo. 113; Damschroeder v. Thias, 51 Mo. 103; O'Fallon v. Clockton, 89 Mo. 284; Turner v. Johnson, 95 Mo. 431; Leahey v. White, 123 Mo. 207; Richardson v. Champion, 143 Mo. 538; Phillips v. Jackson, 240 Mo. 335; Pomeroy, Eq. Jur. (3 Ed.), secs. 1053, 1055; Perry on Trusts (6 Ed.), secs. 172, 215; 39 Cyc. 172, 176 (b). (2) Robinson, having by his acts and declarations, at and before the execution sale at Joplin, created an impression upon those attending the sale that he was buying the property in for Parker, thereby preventing competition in the bidding and obtaining an undue advantage to himself, will be declared by a court of equity to be a trustee for Parker whether there was any express agreement between him and Parker relative to the purchase of this property, or not. The fact that Robinson purchased the property in controversy for a grossly inadequate consideration, together with slight evidences of fraud, is sufficient to set aside this sale and make him a trustee for Parker, but when, as in this case, a large amount of property,—being the holdings of a lifetime of Parker, —are bought at public sale where those in attendance are under the impression that it is being purchased for the debtor, and at less than four per cent of its actual value, this is, in itself, such an inadequacy of consideration as to shock the moral conscience, and, as the setting aside of the sale and the granting of an accounting will not cause respondent to lose anything while a failure to do so will financially ruin the debtor, a court of equity will not hesitate to grant to plaintiff the relief prayed. Phillips v. Jackson, 240 Mo. 335; Leahey v. Witte, 123 Mo. 207; Phillips v. Hardenburg, 181 Mo. 475; Rose v. Bates, 12 Mo. 30; Slowey v. Mc-Murray, 27 Mo. 113; State v. Elliott, 114 Mo. App. 562;

Davis v. McCann, 143 Mo. 177; Hanson v. Neal, 215 Mo. 274.

*McReynolds & Halliburton* for respondent.

(1) If, under the petition in the case, the court can in any way construe it into an implied trust, then the plaintiff must fail because the evidence of such trust is not clear, strong, unequivocal, and so definite and positive as to leave no room for doubt in the mind of the chancellor. Curd v. Brown, 148 Mo. 92; Pitts v. Weakley, 155 Mo. 109; Garrett v. Garrett, 171 Mo. 159; Brinkman v. Gunken, 174 Mo. 709; Heil v. Heil, 184 Mo. 666. (2) The following agreements intended to create trusts are held to be within section 2868, R. S. 1909 (sec. 3416, R. S. 1899), and can only be proved by writing: (A) An agreement by wife to convey to her husband land which he has conveyed to a trustee for her benefit. Price v. Kane, 112 Mo. 412; Crawley v. Crafton, 193 Mo. 421. (B) An agreement that a warranty deed shall convey less than the whole title when there is no fraud or mistake and the deed was not intended as a mortgage. Rogers v. Ramey, 137 Mo. 598. (C) An agreement to purchase land at an execution sale and hold it for another. Hammond v. Cadwallader, 29 Mo. 166. (D) An agreement that grantee in a deed, absolute on its face, would sell the land as agent for the grantor and account for its proceeds. Peacock v. Nelson, 50 Mo. 256. (E) An agreement by the purchaser at a trustee's sale that the purchase was merely to secure his debt, and that he designed afterwards to reconvey. Mansur v. Willard, 57 Mo. 347. (F) An agreement made at the time of the conveyance of the land that the grantee should pay off incumbrances thereon and should reconvey on the grantor repaying him the money so advanced. Hillman v. Allen, 145 Mo. 638; Miltenberger v. Morrison, 37 Mo. 71; Hull v. Small, 178 Mo. 629; Heil v. Heil, 184 Mo. 665. (3) If it should be admitted for the

sake of argument for the plaintiff's contention, that
the defendant Robinson did agree to buy in Parker's
property under the circumstances alleged in plaintiff's
petition, yet the plaintiff could not recover for the
transaction could be treated in no other light (in view
of the conceded facts in this case) than as a contract
with defendant to aid him—plaintiff—in the hindering,
delaying and defrauding of his numerous other press-
ing creditors, and therefore, for this reason, it would
be impossible for him to maintain this suit.  Where
the agreement made, tends or has for its purpose the
hindering, delaying or defrauding other creditors, no
trust can result to him who is guilty of the fraudulent
scheme.  Miller v. Davis, 50 Mo. 572; Buren v. Buren,
79 Mo. 538; Sells v. West, 125 Mo. 630.

BROWN, C.—This suit was instituted May 18,
1909, in the Jasper Circuit Court at Carthage, by
Charles A. Parker, who has died during the pendency
of this appeal, and it has been revived in the name of
Pauline Ferguson, his only heir.  It was tried at the
June term, and on July 31, 1909, after the evidence was
all in, the plaintiff, by leave of court, filed an amended
petition, which, omitting the caption, is as follows:
"Now comes the plaintiff and for his amended
petition herein states that on the —— day of Octo-
ber, 1908, he was the owner of the following described
real estate in Jasper county, Missouri, to-wit:
"The south half of the south half of section
twelve, and the north half of the north half of section
thirteen, township twenty-eight, range thirty-two, and
two acres as follows:  165 feet east and west by 528
feet north and south off of the east end of the north
two-fifths of the east fifty acres of the north half of
the northeast quarter of section eighteen, township
twenty-eight, range thirty-two; the north half of lots
sixty-five and sixty-six in the original town of Webb
City, and a tract beginning 23 feet north of the south-

west corner of lot forty-five in the original town of
Webb City, thence running east 100 feet; thence north
100 feet; thence west 100 feet; thence south 100 feet
to place of beginning, and the undivided one-half of
the north 37 feet of lots forty-five and forty-six in the
original town of Webb City, and fifteen acres in the
southeast corner of the southeast quarter, and the
undivided one half of the east twenty-five acres of the
southeast quarter of the northwest quarter of section
twenty-nine, township twenty-eight, range thirty-two;
that on said day said property was worth the sum of
one hundred and ten thousand dollars, and there was
against it and other property owned by this plaintiff
an aggregate indebtedness of forty thousand dollars;
that the other real estate in said county belonging to
this plaintiff and not specifically described above was
of the value of forty thousand dollars; that certain
judgments had been rendered against this plaintiff in
the circuit court of Jasper county, Missouri, upon
which executions had issued and the real estate above.
described was advertised for sale by the sheriff of
said county and the amount of the executions in the
hands of the said sheriff were less than two thousand
dollars; that the two acre tract above described at
said time was free of mortgage and other liens except
said judgment, and was of the value of three thousand
dollars; that when said property was advertised for
sale, and at all times mentioned in this petition, and for
many years prior thereto, the plaintiff and the defend-
ant were warm personal friends. The defendant used
to be a practicing lawyer at the Jasper County Bar
and during said time was the attorney for the plain-
tiff; that while the defendant was so practicing law,
he was elected judge of the above named court and
subsequently elected to the Supreme Court of the State,
and after his term of office had expired, was again
practicing law in Jasper county, Missouri; that when
the plaintiff's property above described was adver-

tised for sale, he appealed to the defendant, who was a man of large means, to bid in the property for him at the execution sales above mentioned, and agreed to pay the defendant therefor in addition to the amount expended by the defendant, interest on expenditures, and in addition thereto, a reasonable sum for the services of the defendant.

"The plaintiff states that the defendant gave him to understand that he would so bid in said property under the terms above set forth:

"The plaintiff states that previous to the making of said arrangement, he had arranged with one Grant Ashcraft, of Webb City, a man of large means, to bid at said sale on said two-acre tract, and said Grant Ashcraft was then and there ready to bid the sum of three thousand dollars, but after the defendant had given the plaintiff to understand that he would bid in said property for him, and after making the arrangement with the defendant as above set forth, this plaintiff notified the said Grant Ashcraft not to bid on said property; that he had arranged with the defendant to bid in said property for him and give him a chance to redeem the same.

"The plaintiff states that, relying upon said promise and understanding with said defendant to so bid in said property, and believing that the defendant would bid in the same for this plaintiff, plaintiff made no further effort to have persons bid on his said property, but instructed the said Ashcraft as aforesaid not to bid on the same.

"The plaintiff states that said property was offered for sale and by reason of the understanding that plaintiff had thereof, the defendant bid in said property as follows: The said two-acre tract for five hundred dollars, the said land in sections 12 and 13 for five hundred dollars, and the remainder of the property offered at said sale for the sum of eighteen hundred dollars.

"The plaintiff states that the said land in sections 12 and 13 at the day of said sale was well worth one hundred dollars per acre and the said Grant Ashcraft was then and there ready to pay the sum of fifteen thousand dollars on said property at said sale.

"The plaintiff further states that the balance of his said property was bid in by the defendant for the sum of eighteen hundred dollars and that said property was well worth the sum of sixty thousand dollars at that date.

"The plaintiff states that the defendant after he had bid in said property, again repeated to this plaintiff that he would hold the same for him and give him a chance to redeem said property as he had previously agreed to do.

"The plaintiff further states that after the purchase of said property, a deed was made to this defendant for the same, and afterwards in the month of November, 1908, a part of said property with other property was again offered for sale, and this plaintiff, relying on the understanding he had with the defendant, made no effort to procure purchasers at said sale, and the defendant bid the same in at a nominal sum.

"The plaintiff further states that after the making of said agreement and the purchase of said property at execution sale by the defendant, and notwithstanding the arrangement made between the plaintiff and defendant, as above set forth, the defendant for the purpose of getting the complete title to said property, and for the purpose of getting the title of this plaintiff, and in violation of his agreement before said property was bid in, went to one J. W. Aylor, who held a mortgage upon said premises, and solicited and urged the said J. W. Aylor to foreclose his deed of trust upon said property; that at said time the defendant was in no wise interested in the foreclosure of the deed of trust held by said J. W. Aylor, and good faith and fair dealing required and demanded of him that

he prolong the day of said foreclosure instead of soliciting said foreclosure.

"Plaintiff further states that by reason of. the solicitation of this defendant, said property and other property were advertised for sale under a deed of trust, and bid in by the defendant for the sum of twenty-eight thousand five hundred dollars, and the plaintiff states that at the time of said last sale, he still believed that the defendant was acting in good faith for him and did not know that the defendant at any time had solicited and procured the sale of said premises under said deed of trust.

"The plaintiff states that had it not been for the arrangement made with the defendant, he could have procured bidders for said property, who would have paid a sum therefor exceeding fifty thousand dollars more than the entire indebtedness of this plaintiff.

"The plaintiff further states that the defendant now denies said agreement and claims to be the absolute owner of said property and that this plaintiff has no right, title or interest therein.

"Wherefore the plaintiff prays the court for a judgment declaring that the defendant hold said property in trust for this plaintiff, and that the court ascertain the amount of the moneys expended by the defendant, determining the interest thereon, and fix a reasonable compensation to the defendant for his services and then provide a time in which this plaintiff should pay the same and when the same is paid that the defendant be divested of the title to said premises.

"Howard Gray and
"G. E. Booth,
"Attorneys for Plaintiff."

The answer states, in substance, that all the land described in the petition except the two-acre tract in the northeast corner of section 18, township 28 of range 32 was, at the time of the execution sales mentioned in the petition, and had for a long time been

covered with deeds of trust made by plaintiff to secure indebtedness aggregating about $40,000, and was subject to tax liens and tax judgments, and judgments in favor of individual creditors, amounting, in the aggregate, to about $20,000; that he purchased all the real estate at execution sales under judgments of various creditors of plaintiff; that he also purchased the north half of lots sixty-five and sixty-six, and the north seventy-seven feet of lots forty-five and forty-six of the original town of Webb City, and lot ten in Webb's Second Addition to Webb City, at foreclosure sale made by Samuel McReynolds, trustee, and received a trustee's deed, paying therefor $1392.33; also purchased a note signed by plaintiff and wife and secured by a prior deed of trust executed by them, paying therefor $15467.75, the amount of principal and interest due thereon; and that defendant himself held a note secured by deed of trust on the tract in sections 12 and 13, on which about seven thousand dollars of principal and interest is due. The answer denies every other allegation of the petition not so admitted.

The answer further says that after his purchase of the two-acre tract at the execution sale, he told plaintiff if he would find a purchaser for it he would give him all over the sum of $1000 that might be realized on such sale, which he is still willing to do. To the affirmative matter in the answer, issue was taken by reply.

On the trial Mr. Frank Sharp, secretary of the McNeal Machinery Company, testified that his company had a judgment of fourteen hundred and odd dollars against Mr. Parker. It was under an execution issued on this judgment that the sale was made at which the defendant purchased and that the latter told him, after the sale, that he was bidding it in for Charley [Parker]. This witness further testified that before the sale he had tried to get the defendant to stand in with him to bid in the property, but could not, and that

he was at the sale to bid, and that in each instance he made the last bid before Mr. Robinson.

Mr. Aylor, the beneficiary in the deed of trust under which the defendant afterward purchased a part of the property, said that Judge Robinson asked him to close it out—that he wanted to get his money. That he had told defendant that if he did push the thing he wanted him to take care of Mr. and Mrs. Parker, and that defendant said that all he wanted was to get his money and expenses out of it, and that Mr. and Mrs. Parker might have the rest. The witness said that was the only thing he would do. He traded off his note to a man named Thompson, in Texas, and went to Mr. McReynolds, the trustee, and it was closed out. This witness said he was in Kansas City at the time of the execution sale, but would have been present to bid in the property if he had known there was no understanding; if it hadn't been already fixed up he would have been present to bid on it. On cross-examination this witness said: "He never said he was going to buy it in for Parker, but he said all over what was coming to him would go to Parker. All he wanted out of it was what was coming to him and expenses." He also said that he proposed to Robinson that they stand in together and buy in the property. He also said that he had asked Mr. McReynolds to see Mr. Robinson about buying the Parker paper. He did not know whether he had consulted a lawyer about bringing this suit for Parker before he had talked with Robinson about it or not.

Mr. Parker himself testified that when the property was first advertised for sale under the execution he had Mr. Booth write to Judge Robinson to come down. He came, and the plaintiff saw him on the morning of that sale. He said he would bid the property in and give plaintiff a reasonable length of time in which to redeem it—to pay him his money and for his trouble and time. Had first spoken to Grant

Ashcraft because Judge Robinson was so late in coming. Mr. Ashcraft showed up at the sale, and plaintiff told him there was no use to bid because of the arrangement with defendant. At the sale under the Aylor mortgage he made no effort to procure a bidder. Ashcraft was at the sale, and had made an arrangement by which he was to bid for the two-acre tract, which was supposed to be unencumbered, and enough to pay off the execution and judgment under which the levy was made, but when he got over there he found two unsatisfied mortgages on it. Plaintiff called Judge Robinson over to explain to Ashcraft that if the mortgages had been paid they were not a lien on the property, but this did not satisfy Ashcraft, and for that reason he would not and did not bid. The two-acre piece was sold first, and bid in by defendant for five hundred dollars, the plaintiff remarking, "You fellows are robbing me in buying in my property at these prices." This, he says, was said "for its effect on outside bidders."

The defendant denied that he made any agreement or had any understanding with the plaintiff that he would buy in the property for him at the execution sale, although he told him, after the sale, that he could redeem the two-acre tract on the terms mentioned in his answer, and that offer was still open. He also stated that after the execution sale, at which he had paid $2800 for such interest as could be sold under the McNeal judgment, he might have stated and probably did, as he felt that way, that all he wanted was to be let out on account of his expense already incurred and work done in that matter and that Mr. Parker might have the rest. After the sale plaintiff found a purchaser who was willing to pay $3000 for the two-acre tract provided he could get a good title, or even a warranty deed from defendant, who was willing to make a quitclaim deed or a warranty deed subject to

the dower of Mrs. Parker, who was separated from her husband; and he is still willing to do so.

The other lands involved in defendant's purchase under the execution sale were encumbered with deeds of trust in which Mrs. Parker had released her dower. After the execution sale the defendant took steps to secure the foreclosure of one of these held by Mr. Aylor, in which Mr. McReynolds was trustee. Mr. Aylor proposed to Mr. Parker to stand in with him and buy the property, but they failed to come to an agreement, and when the property was advertised by the trustee to be sold March 8, 1909, the plaintiff procured Mr. G. E. Booth, who was one of his attorneys in this case in the trial court, to communicate with the defendant for the purpose of inducing him to buy at the sale for his benefit. Mr. Booth did so, and the matter proceeded until it was closed out by the following letter.

"Jefferson City, Mo., Feb. 28, 1909.

"Friend Booth:

"Yours of the 27th inst. containing notice of the sale of the old Parker property under the Aylor deed of trust came duly to hand this morning. Thanks. I appreciate the fact, as you say, that Parker is hopelessly bankrupt unless some one comes to his assistance at once, but because of that fact I do not feel that I should offer myself as that one. And as to the request of you and Parker that I come to Webb and make arrangements to buy in the property at trustee's sale for him or buy it in my name with right in Parker to redeem whenever he gets able, that is out of the question. While I do not want to discourage your effort in behalf of your client, I must say that I would not think of considering your proposition for one moment, and further, I do not think that you have considered what would be involved in such an undertaking on my part, else you would not ask me to go into it. To bid in the property under an arrangement or agree-

ment with Parker would mean that I not only would be required to advance on day of trustee's sale the amount of Aylor's indebtedness secured by the deed of trust, but that I would become liable (or rather the property bought in and held by me) would become liable for all of Parker's outstanding obligations provided the property so bought in by me could be shown to exceed in value said indebtedness (which would probably be true if the property was given its full value at said estimate), and besides I am also inclined to think that such an understanding on my part would place me in the attitude of surrendering the benefits of my previous purchase at execution sale of Parker's equity of redemption in the property. No such chances as that for me, if you please, and whenever I decide to go into a work of charity of that magnitude it will be in favor of one who shows better prospects of being able to redeem himself, and who has worked harder to avert his misfortunes, than has Parker for the past five or six years.

"I think now that I will be in Webb on Friday and Saturday of this week and will meet on either day you or Mr. Parker, or both of you, if you so wish, but if the only purpose of the proposed meeting is to try to get me into some kind of an agreement for buying in the property at the trustee's sale with right in Parker to redeem, or of having some interest therein with me, or anything of that kind, the meeting might as well not occur."

(There is something more in this letter, but it is about an entirely different matter.)

The property at the time of the execution sale was encumbered with mortgages, judgments and taxes, general and special, amounting, with interest, in round numbers, to forty thousand dollars. While the evidence as to its value was indefinite and uncertain, it was worth largely in excess of that amount. The most valuable tract, known as the Parker saloon property,

·in lóts forty-five ·and forty-six in Webb City was shown to have been worth as much as fifty thousand dollars.

Further reference to facts in evidence will be made in the opinion if necessary.

## OPINION.

I.   The plaintiff has lightened our labor to some extent by filing, with leave of the court, and to secure

Trusts.
conformity to the evidence which was all in at the time, the amended petition now before us.   We may safely assume, therefore, that its statements are his final analysis of the legal effect of the evidence which was already before the court and from which all elements of variance have been eliminated.

The petition states, in substance, that judgments had been rendered against the plaintiff in Jasper county upon which executions had been issued and placed in the hands of the sheriff, who had advertised his land for sale under them; that the whole amount represented by these executions was less than two thousand dollars, that the two-acre tract included in the levy was free from all incumbrances except said judgments, and was worth three thousand dollars; that when the plaintiff's property was advertised he appealed to the defendant to bid it in for him at the execution sales, and agreed to pay him therefor in addition to the amount expended, and interest, a reasonable sum for his services; and "that defendant gave him to understand that he would so bid in said property under the terms above set forth."

This was certainly an indefinite agreement with respect both to its terms and the property it included. The defendant *gave him to understand*—whether with words or a nod or wink is not stated—that he would bid in *said property*.   Even the description of the prop-

erty to which the understanding applied is not given, and it is a most natural inference that the reference is to the two-acre tract that had just been described as much more than sufficient to pay all the executions in the hands of the sheriff. This inference assumes the proportions of a certainty as the pleader proceeds to state that the plaintiff had already arranged with one Grant Ashcraft, a person of large means, to bid *three thousand dollars* for that same two-acre tract. The honest reason that called for the sale of the remainder of the land with its forty thousand dollars of incumbrances, is not elaborated in the petition. Mr. Parker's object is suggested by the remark he says he made ''for its effect on outside bidders'' when the two-acre tract was struck off to Mr. Robinson: ''You fellows are robbing me in buying in my property at these prices.'' It is evident that he would have the court understand that he was not there to make the property yield anything for his creditors, and that Mr. Robinson was there to help him prevent its appropriation to so undesirable a purpose. This is a view of the matter which does not appeal to a court of equity. [Sell v. West, 125 Mo. 621.] It will not assist one to save his property from appropriation to the just claims of his creditors. Leaving this phase of the case, however, for consideration in connection with its bearing upon the general effect of the evidence, we will examine the points urged by appellant as grounds for asking the reversal of the judgment.

II. The appellant insists that the court declare that the defendant hold the property involved in trust for the plaintiff, and that it ascertain the amount of moneys expended by the defendant with the interest thereon, and fix the defendant's compensation for his services. He makes no offer to pay the amount so ascertained, or any part thereof; but asks the court to fix a time in which it shall be paid, and that when it

is paid that the defendant be divested of the title. Waiving for that purpose any question as to the necessity of an offer to redeem as a prerequisite to any relief asked for in the petition, we come directly to the question whether, under its allegations and the evidence adduced, the plaintiff is entitled to any relief whatever.

No law is more familiar than that provision of our Statute of Uses and Trusts which declares that

**Statute of Uses.** "All declarations or creations of trust or confidence of any lands, tenements or hereditaments shall be manifested and proved by some writing signed by the party who is, or shall be, by law, enabled to declare such trusts." [R. S. 1909, sec. 2868.] The effect of this declaration is that a trust in lands cannot be created by oral contract between the parties, for this would be directly in the teeth of the statute; but there are certain trusts called by the generic name of "implied trusts," because they proceed by implication of law out of the particular circumstances of the case, and not from agreement of the parties. The fact that there is no

**Resulting and Constructive Trusts.** such agreement is often the very foundation upon which the relation rests. Some courts have been disposed to divide these trusts into categories, with distinctive names, as "resulting trusts" and "constructive trusts," but have so confused the lines which divide them from each other as to have materially impaired their usefulness for the purpose of legal exposition. Generally speaking, however, a resulting trust is one which the law implies to meet the requirement of justice that a legal status be given to what is the clear intention of the parties; while constructive trusts rest upon the sound public policy which requires that the laws themselves should not become the instruments of designing persons to be used for the purpose of fraud and op-

pression. Dishonesty and deceit are not necessary ingredients of the former, while fraud, either actual or constructive, is the very foundation of the latter, which are accordingly called, by those who delight in garnering expressions from the ripened fields of the classical languages, "trusts *ex maleficio.*" [1 Beach, Mod. Eq. Jur., sec. 226; Brison v. Brison, 75 Cal. 525; Aller v. Crouter, 64 N. J. Eq. 381, 389.] This is the class into which the trust asserted in this case would naturally fall. With respect to it the statute (Id. sec. 2869) provides that "such trust or confidence shall be of like force as the same would have been if the act had not been made." Is such a trust established by the pleadings and evidence in this case?

III. As we have already seen, these trusts do not rest in contract but in fraud, so that should we admit that the statement of the petition,

Fraud as Basis of Constructive Trust.

that the defendant gave plaintiff to understand that he would bid in the property for him at the execution sales to be held in October, 1908, on the terms stated, was sufficient, if true, to charge an agreement to that effect, the plaintiff would have taken only the first feeble step in the case he is trying to make, and the provision we have quoted from the Statute of Uses as well as the similar provision of the Statute of Frauds (Id., sec. 2783), would absolutely bar his further progress. "Equity does not pretend to enforce verbal agreements in the face of the Statute of Frauds, and the person holding the legal title to real estate will not be decreed to be a constructive trustee, unless there is something more in the transaction than the mere violation of a parol agreement. Accordingly, the mere refusal of a trustee to execute an express trust, or the denial of the existence of the trust by him, does not make a case for raising a constructive trust. And where a conveyance in trust is made voluntarily, without solicitation or

undue influence, and no fraud is shown prior to, or contemporaneous with, the execution of the deed, but consists in denying and repudiating the agreement to reconvey, it will not remove the case from the operation of the Statute of Frauds.'' [1 Beach on Modern Equity Jurisprudence, sec. 234.]

The same doctrine was condensed in a few words by Judge NAPTON for this court in Hammond v. Cadwallader, 29 Mo. 166, 169, as follows: ''Where transactions have been tainted with bad faith, there is a resulting trust by operation of law; but the simple violation of a parol contract does not constitute such a breach of faith; for if such was the law, the Statute of Frauds would be virtually repealed. It is not sufficient to call the transaction a fraud or a trust; there must be some artifice or trick employed to make it so, and a confidence reposed by one party in another on the faith of which something has been lost on one side and gained on the other. . . . Nothing is better settled than that, where a trust of this kind is sought to be enforced, fraud must be distinctly alleged and clearly proved.''

IV. It being incumbent on plaintiff not only to prove but to plead fraud on the part of defendant in connection with the purchase of the lands in order to charge him as trustee with respect to the title he obtained at the sale, he attempts to carry that burden upon the theory that the alleged agreement to purchase them for plaintiff's benefit was made and used for the purpose of suppressing bidding and thereby obtaining the land for less than it would have otherwise brought. For this purpose he pleaded in his petition that he had arranged with one Grant Ashcraft to bid three thousand dollars on the two-acre tract, but after he had been given to understand by defendant that he would bid in said property, plaintiff notified Ashcraft of the arrangement, and not to bid.

*Evidence.*

That Ashcraft did not bid on that tract, and defendant was thereby enabled to and did bid it in for five hundred dollars. That Ashcraft was ready to pay fifteen thousand dollars on the three hundred and twenty acre tract in sections twelve and thirteen, but that defendant bid it in for five hundred dollars, and bid the remaining land described in the petition and included in the sale for eighteen hundred dollars, or two thousand eight hundred dollars in all. The foregoing are substantially the pleaded facts out of which must be selected those which constitute the fraud or trick by which the plaintiff was cheated out of his land under the pretense that the defendant was simply taking the legal title to enable him to save it from sacrifice. It remains to examine the evidence to determine how well the plaintiff has maintained his position.

V.   It was said by this court in Pitts v. Weakley, 155 Mo. 133, that "in case of an express trust in real estate, the burden of the chancellor is relieved, and at the same time his power curtailed by the provisions of the Statute of Frauds which requires that it be 'manifested and proved by some writing signed by the party.' " Such charges upon lands are not permitted to lie in the memory of individuals or to depend upon the truthfulness or honesty of those who claim to be their repository, nor the accuracy of human memory or human statement. The law wisely requires that they shall be preserved in writing, so that their inspection may settle all differences as to their existence and terms. But experience has shown that even the wisest law that human intelligence and foresight can construct, may be made by the designing and wicked the instrument of fraud and wrong; and to place it within the power of a court of equity to guard against this it is provided that whenever such trust or confidence shall arise by implication of law, the statute requiring it to be in writing shall not apply. The danger so

carefully guarded against in case of express trusts is, as a matter of necessity, boldly encountered in the case of these implied ones, and oral testimony, as dangerous in one case as in the other, but the least of the two evils in the latter, admitted to establish them. This is done with great caution. Although the proof may not be made by something which the eye can see and the hand touch, and in which time with its mutations can work no shadow of change, yet the next best thing may be required in evidence so convincing that no reasonable doubt is left in the mind of the chancellor as to its truth or meaning. The character of this evidence has been described by this court in many ways differing in form, but not in meaning. It is said that it "must be clear, cogent and fully satisfying the chancellor" (Hillman v. Allen, 145 Mo. 638, 644); that "the insecurity of titles and the temptation to perjury, among the chief reasons demanding that contracts affecting lands should be made in writing, also imperatively require that trusts arising by operation of law should not be declared upon any doubtful evidence, or upon a mere preponderance of evidence. There should be no room for a reasonable doubt as to the facts relied upon." [Johnson v. Quarles, 46 Mo. 423, 426.] To warrant a decree the evidence should be "of a character so clear, definite and positive, as to leave no room or reasonable ground for hesitancy in the mind of the chancellor." [Forrester v. Scoville, 51 Mo. 268, 269.] "Such evidence must be well-nigh conclusive in its character." [Shaw v. Shaw, 86 Mo. 594.] And we have spoken to the same effect in many other cases. The language quoted by Judge Sherwood in Ringo v. Richardson, 53 Mo. 385, 394, from Baker v. Vining, 30 Me. 126, is particularly striking, and is as follows: "And so cautious have courts been in the reception of such evidence [meaning oral], although the proofs have been allowed to be read, yet if there was any secret in the cause not understood, the relief

sought has been denied.'' The learned Judge further said: ''Other authorities hold, that the evidence in support of the alleged trust is a dangerous species of evidence, and therefore to avail anything must be clear, strong and unequivocal and leave no room for a reasonable doubt in the mind of the chancellor as to the existence of such a trust.''

We have spoken thus far of the quantity and probative force of the evidence required to establish *a* constructive trust, but it remains to apply the same principles to the establishment of *the* particular trust alleged in this case. A voluntary or express trust is void unless manifested and proved by some writing signed by the party who creates it. The court must be able to determine from this writing the existence, terms and limits of the trust. When it is attempted to prove a constructive trust by oral evidence the same facts must be shown—the use of words sufficient to create it, and to define its terms and limits. Although the nature of the evidence is different in one case from that in the other, the facts to be proved are alike in both. [Pitts v. Weakley, supra, and cases cited.]

Applying these rules to the evidence, does it prove the creation of a trust, or the terms of the trust charged or attempted to be charged? The rules require that the parties should disclose all the facts necessary to enable the court to understand the transaction, and if there remains any secret the relief is denied. There is a secret at the threshold of the transaction which we confess our inability to understand. Mr. Parker claims to have had an arrangement with Mr. Ashcraft by which the latter agreed to bid three thousand dollars for the two-acre tract, which would have paid the executions then in the hands of the sheriff and left a surplus of more than one thousand dollars, yet he made his arrangement with defendant, if he is to be believed, and told Mr. Ashcraft that there was no use for him to bid on the property.

The latter remained at the sale, however, and was, according to his own statement and the allegations of the petition, ready to pay fifteen thousand dollars or better for the three hundred and twenty acres in sections twelve and thirteen, and from twenty-five hundred to three thousand for the two acres, had he not been called off by Mr. Parker. If these statements are true, and Mr. Parker committed himself to them in his petition, founding his claim for relief upon them, then he did not desire to sell the two-acre tract for enough to pay off the executions out against him; he did not desire to sell the remaining land for the best price as a means of reducing his indebtedness; but he did desire that all the property should pass through the execution sale, and come out clean of any liability for his debts other than those already charged against it as liens. Whatever of suspicion we have that Mr. Parker was trying to manipulate this sheriff's sale for the purpose of heading off his judgment and other creditors is strengthened by his own statement that after he claims to have made this arrangement with the defendant, he had some lots which he owned in Webb City through an unrecorded deed, conveyed directly to Mr. Ashcraft by his grantor, and together they destroyed the original deed to Mr. Parker. The latter stated that he would have to go to the record to ascertain how many judgments were standing against him at that time. He explains the adoption of this method of transferring the title by saying: "That was a transaction between myself and Mr. Ashcraft." Mr. Ashcraft made the following explanation of his own connection with the same transaction: "Q. You knew the title to that land was in Parker, and Parker had a warranty deed? A. Yes. Q. And you got that warranty deed and destroyed it? A. Yes. . . . Q. You knew there were judgments against him when you did that? A. Yes. Q. You knew if the deed to Parker went on record, those judgments

would be a lien on that property? A. I did." It is due to this witness, as well as to Mr. Parker, that we should state that he said positively that this deed was not destroyed "for the purpose of cutting out judgments against Parker," but his failure to suggest another explanation forces us to the conclusion that he was working with Parker to hinder his creditors from the collection of their claims. Equity, as we have already intimated, will afford plaintiff no assistance to enforce any arrangement he may have made with defendant having this purpose in view.

VI. There was little evidence tending to show that the bidding at the execution sale was affected by any alleged arrangement or understanding between Parker and defendant, or that anybody took Mr. Parker into consideration in the matter. Mr. Sharp, who represented the plaintiff in the execution under which the land was sold, was a witness for plaintiff, and testified that before the sale he had tried to get the defendant to stand in with him to buy the property and that he agreed to do so but did not. The witness was an independent bidder on each piece of the property.

Mr. Ashcraft says he went to the sale to bid on the two-acre tract at the request of Mr. Parker, who testifies that when he got there and examined the abstract, which showed two unsatisfied mortgages, he got scared, which the witness supposed was one reason why he refused to buy it. The defendant was called into the talk about these mortgages, and advised that if they had been paid, as, Mr. Parker insisted, they were no longer an incumbrance on the land, but Mr. Ashcraft was not willing to run the risk.

The evidence of an agreement on the part of the defendant, and its terms, consists of the statement of Mr. Parker, the nature of which is strikingly indicated by the terms in which it is pleaded in the peti-

tion—"that the defendant gave him to understand."
The remainder of the evidence directed to this point
consists of statements said to have been made by the
defendant, the character of which is illustrated by the
testimony of Mr. Aylor for the plaintiff, which is,
perhaps, the most direct and definite of all. We make
the following extracts from his account of the con-
versation on which plaintiff relies, held at witness's
house after the advertisement and before the sale
under his deed of trust, which occurred March 8, 1909.
He said: "He never said he was going to buy it in
for Parker, but he said all over what was coming to
him would go to Parker. All he wanted out of it was
what was coming to him and expenses. . . . Q.
You did propose to Robinson during this conversation
that you and him stand in together and buy in this
property? A. Well— Q. Did you or did you not?
A. Yes, I said that."

The defendant freely says that after the execution
sale he told Parker, in answer to his statement that
he had been robbed, that he would give
him a chance to redeem. We take for
granted that, whenever it was called for
he made this statement as freely to others as to Mr.
Parker, but the fact so stated would have no tendency
to prove those circumstances of fraud necessary to
establish the trust asserted by the plaintiff, which is
founded upon an agreement before the sale, and used
to suppress bidding and bring about the sacrifice of
the property. This class of evidence at its best is not
of that clear and convincing character called for in
such cases. This court in Pitts v. Weakley, already
cited, said of it: "Even in ordinary lawsuits that is
not a high grade of evidence. Every text writer on
the subject treats it rather with toleration than favor.
Greenleaf says: 'With respect to all verbal admis-
sions, it may be observed that they ought to be received
with great caution. The evidence, consisting as it does

*Evidence of Oral Admissions.*

of the mere repetition of oral statements, is subject to much imperfection and mistake.' [Greenl. on Evid. (15 Ed.), sec. 200.]'' These cautionary statements are peculiarly applicable to the testimony in this case, replete as it is with inconsistent statements, evidences of extreme reticence of witnesses in the treatment of some questions, united with great willingness to impart information with respect to others, and the subtle suggestion of a doubt pervading the testimony of some whether they were actuated by an unselfish desire to vindicate outraged virtue rather than by chagrin at not having been bidden to the killing. The trial judge, who saw as well as heard these things, had a much better opportunity to judge of them than we have, and his conclusion does not lack support in the record.

VII.   In view of what we have already said, the charges contained in the petition with reference to the foreclosure of the Aylor deed of trust are unimportant. It is founded entirely upon the assumption that at the time of that sale the defendant stood in a *fiduciary* relation to Mr. Parker, growing out of the purchase at the execution sale in October, 1908, to which we have already referred.

The judgment of the Jasper Circuit Court is affirmed. *Blair, C.,* concurs.

PER CURIAM.—This case coming into Banc because two of the divisional judges did not sit, the opinion of Brown, C., is adopted as the opinion of the court. *Lamm, C. J., Graves, Brown* and *Walker, JJ.,* concur. *Faris, J.,* concurs in the result. *Woodson* and *Bond, JJ.,* not sitting.