A. Y. SCHULTZ, et al., Appellants,

v.

Sol SCHULTZ, et al., Respondents.

Edmund C. ROGERS, Intervenor,
Appellant,

v.

Sol SCHULTZ, et al., Respondents.

A. Y. SCHULTZ, et al., Respondents,

v.

Sol SCHULTZ, et al., Appellants.

A. Y. SCHULTZ, et al., Respondents,

v.

Allan MOLASKY, et al., Appellants.

No. 63434.

Supreme Court of Missouri,
En Banc.

Aug. 23, 1982.

Jim J. Shoemake, J. Richard McEachern, St. Louis, for A. Y. and Jack Schultz.

Curtis, Crossen, Hensley, Allen, Curtis & Altman, Thomas B. Curtis, Thomas E. Allen, St. Louis, for intervenor-appellant.

Theodore D. Ponfil, Blumenfeld, Mary & Tureen, P. C., St. Louis, for respondents.

SEILER, Judge.

This is an equitable action to determine ownership of fourteen shares, and ultimately control, of the Chemical Dynamics Co., d/b/a The Schultz Company, in St. Louis. The cause was transferred from the court of appeals, eastern district, after opinion.[1] We will determine the case as if on original appeal. Rule 83.09.

To understand the ownership issues, a brief history of Chemical Dynamics Co., d/b/a the Schultz Company [hereinafter the Schultz Co.], is necessary. The principal are the Schultz brothers: A. Y. (Abe), Jack, and Sol Schultz [hereinafter Abe, Jack, and Sol].

In 1947, the Schultz Co. was first incorporated and was known as the Schultz Shoe Co. Its principal business was shoe repairing and was conducted by Abe and his father. The company now makes liquid fertilizer and plant food. At the time of the senior Schultz's death, there were ten shares outstanding and held as follows: father—three shares; Abe—three shares; Harry Schultz (another brother)—two shares; and Marvin Saks (a brother-in-law) —two shares. The company paid $15,000 to the mother for her husband's three shares. Harry Schultz left the company and St. Louis in the early 1950's and Abe bought his shares for $5,000. When Marvin Saks left the company in the early 1960's nothing was done with his shares. In 1967, the company was sold to Tama Packing Co. in Tama, Iowa. As part of this deal, 200,000 shares of Tama were issued, all in Abe's name, in exchange for the 10 shares of Schultz Co. stock. Shortly thereafter, this deal was rescinded largely through the personal and financial efforts of Jack and the company returned to St. Louis.[2] The original ten shares of Schultz Co. all came back in Abe's name. Subsequently, to raise money, twenty additional shares were issued. Ownership of fourteen of these shares is at issue.

In 1968 Jack bought ten of the newly issued shares and Ben Fixman, a family friend, bought ten [hereinafter the Fixman shares] for which each man paid a total of $100,000 to the company ($80,000 cash and $20,000 loan). Although not an active participant in the company, Jack was asked to help the company, this time by arranging marketing of the company's products through the Cupples Co. To interest Cupples, Jack sold five of his shares at $14,000 each to representatives of Cupples. He then sold one share to Larry Newfeld, a Schultz Co. employee, for $11,000. As part of this sale, Jack prepared and Newfeld signed an agreement whereby Abe was to vote this share. The voting rights of this share are also disputed. At this point in 1968, Jack, who was undergoing personal and marital problems, which he blamed at least partly on his involvement with the company, moved to California and stated he wanted no further contact with the Schultz Co. Jack turned over the remaining four shares to Sol who, as secretary of the company, reissued certificates in his own name.[3] In his letter to Sol, Jack explained including the stock by writing, "The Schultz Company has requested that its stock be returned. . . ." Ownership of these four shares is at issue. Shortly thereafter Sol sold one share for $25,000 to non-family members Robert Wolff and Gilbert Kopolow and went to Hawaii with the proceeds.[4] This sale precipitated an argument between Sol and Jack which ended with Sol throwing the remaining three certificates on Jack's desk with the instruction "to stick them . . . ." Jack has had physical possession of the three certificates since that time and claims ownership of these shares.

Jack had negotiated for purchase of eight shares of the Fixman stock for $80,000 in late 1968 but no sale resulted. Later, in

---

1. Portions of the court of appeals opinion and the dissent are used without quotation marks.

2. Jack testified that Abe, Sol, Larry Newfeld, and Ben Fixman were involved in this move.

3. The record reveals Sol, as secretary, did an inadequate job in recording transfers of Schultz

stock. Furthermore, the stock transfer book had been lost since 1969 and could not be produced at trial.

4. There was also testimony that this was a loan with the share as collateral rather than a sale.

August, 1969, within a year of saying he wanted no further contact with the Schultz Co., Jack was called off a California golf course for a telephone call from Sol. Sol was in the office of Tom Igoe, an officer of the Clayton Bank. Sol told Jack that they could buy all ten Fixman shares for $50,000 which would give the family control again, but Sol had neither the money nor credit to buy them. The bank would lend neither Sol nor the Schultz Co. money on the stock, but would be happy to lend the money if Jack, who had a good business reputation, would guarantee the loan (a demand note). The loan officer testified that it was his understanding that the stock was to go in the "family pot" for the benefit of the Schultz family. This Jack agreed to over the telephone, an agreement formally signed when Jack was in St. Louis. The bank held the ten Fixman shares and Abe put up his ten shares as collateral in addition to Jack's guarantee. Jack paid the interest and principal with the exception of a few interest payments made by the company. When the bank called the note, it looked only to Jack for payment. Upon payment, Jack received Sol's note endorsed to him and the envelope containing the twenty shares which he handed to Sol saying, "Take these out to Abe and go to work." Sol gave Abe his ten shares and again as secretary, reissued certificates in his name for the other ten shares. At no time did Sol make an attempt to repay Jack.

For the first time, the company in 1973 or 1974 began to make money. In the spring of 1976 Abe and Jack learned that Sol was negotiating to sell his stock to Allan and Mark Molasky [hereinafter the Molaskys]. As a result, this action was brought to determine ownership rights in the stock. Edmund Rogers, an attorney who had represented the company and was a minority shareholder, obtained leave to intervene.

While the action was pending, a contract was entered into for Sol to sell, for $1,000,-000.00, the thirteen shares to the Molaskys, who took with full knowledge of the pending lawsuit and disputed claims. (See fn. 8.) The Molaskys were joined in the litigation. The Molaskys then transferred ownership to Melanjo, Inc., a Florida corporation, wholly owned by a Molasky daughter. Melanjo and the daughter were also joined.[5]

The plaintiffs' group had control of 19¾ shares while the Molaskeys had control of 6¼ shares with ownership disputed in 14 shares. There was a total of 40 shares issued and outstanding.

The plaintiffs' primary theory is that ownership of the disputed stock is in the Schultz family for the benefit of the Schultz family.

Trial was held on several days over a period from February to September, 1977. Merle Silverstein (Jack's attorney), Jack, Abe, Thomas Igoe, and Edmund Rogers (the company attorney and intervenor), testified for the plaintiffs. Only Sol testified for the defendants. The trial court entered its findings of fact and conclusions of law and judgment on March 16, 1978. After motion for rehearing, the court entered amended findings and conclusions of law on June 29, 1978, which included appointment of a receiver. This was the subject of a prohibition action.[6] The trial court found that since its inception, the Schultz Co. "has always been operated as a family venture for the benefit of the Schultz family, namely, A. Y., Jack, Sol and Harry Schultz, ('The Schultz Brothers') and Marvin Saks (a brother-in-law of the Schultz Brothers)." It found that Jack had given financial support to the company over the years. Furthermore, it found that Sol had "been financially dependent on, or has been sup-

5. The trial court found this latter transaction a nullity because it concluded the purported transfer was an attempt to remove the Schultz Co. stock from the court's jurisdiction.

6. The court of appeals, eastern district, issued a preliminary writ and later made it absolute. The appointment of the receiver was void and

in excess of the trial court's jurisdiction because such relief was not requested by the parties in their posttrial motions and was awarded more than 30 days after entry of the original judgment. *State ex rel. Chemical Dynamics, Inc. v. Luten*, 581 S.W.2d 921 (Mo.App. 1979).

ported by his brother Jack Schultz by the means of cash gifts, use of apartment facilities and the use of an automobile."

The trial court's findings as to ownership of the stock were as follows:

1. Jack is the owner of the three shares in his possession for the benefit of the Schultz family;

2. Wolff and Kopolow, who paid $25,000 to Sol for the one share, owned the equitable interest and the Schultz family owned the legal interest and voting rights;

3. Sol had equitable title to the ten Fixman shares which are subject to "an implied equitable trust vesting all voting rights and legal title in such ten shares in The Schultz Family",[7] and his attempted transfer to the Molaskys conveyed only the equitable interest;

4. Lawrence Newfeld had only equitable title to the one share, the legal title and voting rights being in the Schultz family, and thus was able to convey only equitable title to the Molaskys.

All parties, plaintiffs, defendants, and intervenor, appealed the judgment of the trial court in some respect.

This court must sustain the judgment of the trial court "unless there is no substantial evidence to support it, unless it is against the weight of the evidence, unless it erroneously declares the law, or unless it erroneously applies the law." *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976) (construing Rule 73.01(c)).

Plaintiffs and intervenor appeal only the trial court's ruling that Sol, as equitable trustee, conveyed equitable title to the Molaskys. They do not challenge the findings of fact from which the trial court concluded that Sol held the ten Fixman shares as an equitable trustee for the benefit of the Schultz family. They do, however, allege that the trial court misapplied the law of constructive trusts. Defendants argue that the trial court's findings were not supported by substantial evidence and were confusing and should be set aside.

■ Constructive trusts are technically not trusts at all, but rather, are equitable devices employed by courts of equity to remedy a situation where a party has been wrongfully deprived of some right, title, benefit, or interest in property as a result of fraud or violation of confidence or faith reposed in another. *Suhre v. Busch*, 343 Mo. 679, 123 S.W.2d 8, 15 (1938).

Constructive trusts do not, like express trusts and resulting trusts, "arise by virtue of agreement or intention, either actual or implied, but by operation of law, or, more accurately, by construction of the court, regardless" and independently of any actual or presumed intention of the parties to create a trust.... It is said, "Fraud, either actual or constructive, is the very foundation" of constructive trusts "which are accordingly called, by those who delight in garnering expressions from the ripened fields of the classical languages, 'trusts ex maleficio.'" *Ferguson v. Robinson*, 258 Mo. 113, 167 S.W. 447, 452. They are not technical trusts and in imposing or declaring a constructive trust a court of equity merely uses the machinery of a trust to prevent fraud or provide a remedy in cases of fraud, actual or constructive, by making the person who has wrongfully acquired property, or has acquired property under such circumstances as make it inequitable for him to retain it, a trustee for the person defrauded or injured by such fraudulent or wrongful conduct.

*Id.*

In the bank transaction involving the ten Fixman shares, there was evidence to support the trial court's conclusion that Jack Schultz was the principal with Sol being the nominee to hold the shares for the benefit of the Schultz family. Both Jack and Sol had negotiated for the purchase of these shares. This block of shares was important to give Schultz family control. Igoe had

---

**7.** The trial court used the term "implied equitable trust" but from the court's findings of fact and conclusions of law it is obvious that the court was applying constructive trust principles.

had dealings with those members of the Schultz family who were directly involved in the Schultz Co. and would not lend money to them or to the company, but would lend the money on Jack's guarantee because his word was "as good as gold." Tom Igoe, the loan officer of the Clayton Bank, testified that he understood that the stock was to go in the "family pot", *i.e.*, it was for the benefit of the Schultz family. When the loan became due, the bank through Igoe made no demand on Sol, but made demand directly on Jack, who promptly paid the note. The shares, both Abe's which had been pledged as collateral and the Fixman shares, were handed over to Jack. The fact that Abe's shares were pledged, payment was made by Jack, and the deal was negotiated by Sol, is substantial evidence that the Fixman shares were not bought for Sol alone but were bought for the benefit of the entire family and to retain control of the company in the family. The shares were handed to Jack, who told Sol to take them all (Abe's and the Fixman shares) to Abe and to get to work. Jack's turning them over to Sol as the corporate secretary with Abe's shares was in keeping with the ostensible purpose of the stocks' acquisition in the first place—that it was to be kept within the Schultz family and not to be available for Sol's disposition.

■ Because the trial court's conclusion that Sol held the Fixman shares as constructive (or equitable) trustee is supported by substantial evidence, that portion of the judgment must be affirmed. However, the trial court misapplied constructive trust principles when it held that Sol as equitable trustee could convey equitable title to the Molaskys. Sol's only duty as equitable trustee was to hold the stock for the benefit of the Schultz family. When Sol attempted to sell the Fixman shares, he breached this

trust and he was unable to convey either equitable or legal title to the Molaskys who were not bona fide purchasers.[8] The trial court's judgment must be reversed insofar as holding that the Molaskys have equitable title. The Molaskys have the same title that Sol had—equitable trustee—and have the duty to reconvey the Fixman shares to the members of the Schultz family.

Moreover, the trial court's judgment that the Schultz family is defined as Abe and Jack must be reversed because not based on substantial evidence. Plaintiffs in their pleading asked that the shares be declared "the subject of a trust for the benefit of plaintiffs A. Y. Schultz and Jack Schultz and defendants Sol Schultz, Harry Schultz and Marvin Saks." The evidence adduced at trial comports with this. Therefore, the judgment of the trial court must be set aside insofar as it declares that the beneficiaries of the trust are only Abe and Jack. The stock must be held for the benefit of the above-named members of the family.

■ Defendants argue that the trial court's finding that the share of stock sold by Jack to Larry Newfeld was divided into legal and equitable interests is erroneous. In 1968, Jack sold one share to Lawrence Newfeld, a longtime company employee, for $11,000. Newfeld signed an agreement, written in longhand by Jack which read as follows:

March 29, Lawrence Newfeld. Received your check for $11,000.00 for one share of Schultz Shoe Company, Inc. stock. You have agreed to give the stock power to A. Y. Schultz, President of Schultz Shoe Company, Inc. I am having you, Larry, sign this letter so that you fully understand that this share of stock is to be voted by A. Y. Schultz or his successors.

---

**8.** Sol and the Molaskys entered into what was essentially a quitclaim deed. The pertinent contract provision is as follows:

Purchaser and all guarantors of Purchaser's obligations hereunder acknowledge, understand and agree, any provision to the contrary notwithstanding, that Purchaser is only purchasing whatever interest in said 13 shares being sold hereunder which Seller has

therein and that Purchaser is not and shall not be entitled to any rebate, refund, discount, reduction in price or abatement or credit with respect to all or part of the $1,000,000.00 purchase price and salary being paid herein, regardless of the outcome of the claims and/or litigation referred to in Exhibit A annexed hereto.

You will receive your share of stock as soon as the papers are drawn by the company's attorney, Robert Mass, and he will transfer the stock to you one day next week.

This agreement did give Abe Schultz authority to vote the share and perhaps it could be considered a proxy. If so, however, inasmuch as it did not provide otherwise, it became invalid as a proxy eleven months after the date of the execution. § 351.245.4, RSMo 1978. Although the trial court found as a fact that since March 29, 1968, A. Y. Schultz has exercised the voting rights to such share of stock we are unable to find any evidence supporting this finding. When his deposition was taken in November 1976, Lawrence Newfeld said he did not remember the letter and testified that he had at all times voted the stock since his acquisition and that A. Y. Schultz had never voted it. A. Y. Schultz testified he was not aware of the existence of the letter until the present action was filed and that whenever the share was voted it was done by Newfeld himself. The agreement was approximately ten years old at the time of trial. It seems never to have been enforced, and we see no support for the trial court's finding that the share should be divided into separate legal and equitable interests, with the legal title and voting rights in A. Y. Schultz or his successors for the benefit of the Schultz family. Therefore, this portion of the judgment must be reversed.

Defendants allege it was error to impress a constructive trust on the share Sol sold to Wolff and Kopolow in 1968. This we agree with. Abe during cross-examination testified as follows:

Q. But you did recognize their [the Schultz family] legal right to sell these shares?

A. I did not recognize their legal right to sell these shares. I said if one wanted to violate the family concept, it would be a violation of the family trust, because no restriction was written on it, and some unsuspecting person could buy them, and we would have no recourse against some

unsuspecting person. So I said to you, yes, insofar as a certificate was written up, not being qualified, any member of the family wanted to be a traitor to the family could manipulate and try to sell a share much in the manner in which Sol sold one to Bobby Wolff. *We didn't contest Bobby Wolff.* (Emphasis supplied).

The trial court in impressing a constructive trust is applying an equitable remedy. While sitting as a court of equity, it would be anomalous to perform an inequitable act. Because the sale took place nine years before trial and because one of the plaintiffs admitted that they did not contest the sale, we cannot find that there was evidence to support the trial court. This portion of the judgment must be reversed.

Defendants argue that the trial court erred in holding that Sol had "abandoned, unequivocally transferred and returned" the three shares to Jack and that these three shares "are the absolute property of Jack Schultz for the benefit of the Schultz family" because such finding of the court was clearly against the weight of the evidence.

A person claiming a gift has the burden of proving the gift by clear and convincing evidence. *In re Petersen's Estate*, 295 S.W.2d 144, 150 (Mo.1956). The elements of a gift are "a present intent to make a gift on the part of the donor, a delivery of the property by the donor to the donee, and an acceptance by the donee . . . ." *Wantuck v. United States Savings & Loan Assn.*, 461 S.W.2d 692, 694 (Mo. banc 1971), *overruled on other grounds, In re La Garce's Estate*, 487 S.W.2d 493 (Mo. 1972); *Firestone v. Yoffie*, 494 S.W.2d 394, 398 (Mo.App.1973). In the present case plaintiffs adduced substantial and convincing evidence that Sol intentionally and voluntarily threw the share certificates on Jack's desk and that Jack has at all times since retained possession of these certificates. These actions constitute actual physical delivery and acceptance of the share certificates. *Smith v. Smith*, 192 S.W.2d 691, 698 (Mo.App.1946). Further, we believe that the greater weight of the evi-

dence supports the conclusions that Sol delivered and Jack accepted the stock certificates. The only evidence which mitigates against these conclusions is Sol's evasive testimony that he could not remember how he had "lost" possession of the certificates. Sol speculated that he must have left the certificates in Jack's home while residing there. The trial judge, having had the opportunity to hear both Sol and Jack's testimony, found that Sol had transferred the share certificates to Jack. *Murphy v. Carron*, 536 S.W.2d at 32. Defendants argue that the evidence is less than clear and convincing that Sol intended to make a present gift. Defendants contend Sol's lack of donative intent is apparent because Sol never endorsed the certificates, which had been issued in his name. The fact that Sol delivered the certificates to Jack and the language Sol used at the time of delivery demonstrate, in our view, that Sol had the intention to transfer ownership and title to the stock to his brother. *In re Kies Estate*, 320 S.W.2d 478, 482 (Mo.1959). Because the evidence shows Sol had the requisite donative intent and there was delivery and acceptance of the share certificates we conclude that Sol made a complete gift inter vivos. Pursuant to § 400.8–102, Jack has the specifically enforceable right to have the certificates endorsed to him to hold for the benefit of the Schultz family as earlier defined.[9]

In summary, the judgment of the trial court is affirmed in part, modified in part, and reversed in part. That portion of the judgment which holds that Jack holds the three shares in trust for the Schultz family is affirmed but modified to define the Schultz family as including Abe, Jack, Sol, and Harry Schultz, and Marvin Saks. That portion of the judgment which holds that the ten Fixman shares are subject to a constructive trust is affirmed, but that portion which holds that Sol conveyed equitable title to the Molaskys is reversed and modified to provide that Sol is equitable trustee for the benefit of the Schultz family as defined above. That portion of the judg-

ment which holds that the Newfeld share was divided into legal and equitable interests is reversed. That portion of the judgment which holds that the Wolff and Kopolow shares are subject to a constructive trust is reversed.

DONNELLY, C. J., and RENDLEN, WELLIVER, MORGAN and HIGGINS, JJ., concur.

BARDGETT, J., not participating.

---

9. Jack Schultz does not contest on this appeal the finding of the trial court that he is to hold the three shares for the benefit of the Schultz family.