**RALLS COUNTY MUTUAL
INSURANCE COMPANY,
Respondent,**

v.

**RCS BANK, f/k/a Ralls County
State Bank, Appellant.**

No. ED 92732.

Missouri Court of Appeals,
Eastern District,
Northern Division.

June 29, 2010.

Mark S. Wasinger, Hannibal, MO, for Appellant.

Louis J. Leonatti, Mexico, MO, for Respondent.

ROBERT G. DOWD, JR., Judge.

RCS Bank f/k/a Ralls County State Bank ("Bank") appeals from the judgment entered in favor of Ralls County Mutual Insurance Company ("Insurance Company") imposing a constructive trust in the amount of $126,789.63. We reverse.

Insurance Company is a county mutual insurance company providing casualty and liability insurance located in Center, Missouri. Ted Summers ("Summers") acted as secretary/treasurer of Insurance Company and managed its day to day operations. In 1998, Summers was elected to Insurance Company's board of directors. Summers served on Insurance Company's board of directors and as secretary/treasurer until his resignation in 2001. From 1993 until 1999 when Insurance Company's operations and records were moved into a new building, Summers' home served as both the main office and storage facility for Insurance Company's records. Summers had authority to process all policies, receive all premiums, and pay all claims.

Summers was also a senior vice-president of Bank and a member of its board of directors. Summers managed the Center, Missouri facility and loan portfolio for Bank. Prior to December 2000, the president of Bank, James Behrens ("Behrens"), had no concerns about Summers. In December 2000, Behrens became concerned about Summers' trustworthiness when the monthly past due loans for Bank jumped dramatically with no explanation from Summers. Summers was fired from Bank in January 2001 because of inaccuracies in reports provided to Bank's board of directors and bank examiners with regard to the past due loans.

Bank acted as Insurance Company's depository bank. Bank was also listed as the loss payee on some of the insurance policies of Insurance Company's customers. From the time Summers became the secretary/treasurer for Insurance Company, Insurance Company directed Bank to send monthly statements for all its accounts solely to Summers. In addition, Insurance Company authorized Summers to sign checks and make withdrawals on behalf of Insurance Company. In 1975 or 1976, Insurance Company opened an account known as the Wind Premium Trust Account at Bank. Insurance Company did not originally provide wind coverage to its policy holders. The Wind Premium Trust Account was a separate account where insurance premiums for wind coverage were deposited. The purpose of the Wind Premium Trust Account was to receive premiums owed for wind coverage and forward the premium to the appropriate insurance company. When the account was established, Summers and the president of Insurance Company were granted signature authority. After the 1970s, Summers was

the only person having signature authority on the Wind Premium Trust Account.

In 1993, Insurance Company directed the Wind Premium Trust Account be combined with the other general operating accounts because Insurance Company began to offer its own wind coverage and the Wind Premium Trust Account was no longer necessary. Summers failed to close the Wind Premium Trust Account. The president of Insurance Company, Dean Baker, believed the account had been closed. However, Summers continued to divert premium funds into the Wind Premium Trust Account at Bank. Summers would prepare a yearly report that was submitted to the Department of Insurance of the State of Missouri, and provide Insurance Company's board of directors with a copy of the yearly tax return. The Department of Insurance conducted audits of Insurance Company in 1995 and 1999. Insurance Company's board of directors reviewed the audits. None of these documents contained any information about the Wind Premium Trust Account.

After conducting the 1999 audit, the Department of Insurance recommended that Insurance Company hire a certified public accountant to conduct a financial audit. Insurance Company hired Mel Van de Ven ("Van de Ven"). Summers told Van de Ven that Insurance Company had an operating account and a money market account at Bank. Summers did not disclose the existence of the Wind Premium Trust Account. Van de Ven discovered the existence and account history of the Wind Premium Trust Account. From January 1994 through January 2001, Summers misappropriated $346,597.00 from the Wind Premium Trust Account. Summers removed funds from the Wind Premium Trust Account by writing checks to Bank and others or by purchasing cashier's checks or personal money orders payable to Bank, many without further endorsements. Summers had authority to issue personal money orders on behalf of Bank. Some of the funds were used for loan payments due to Bank by other customers of Bank.

Insurance Company subsequently filed a suit against Bank and a number of other individuals including Summers, who passed away during the pendency of the lawsuit.[1] By the time of the trial, Insurance Company only sought to proceed on its count for a constructive trust against Bank. In its count for a constructive trust, Insurance Company alleged it was entitled to a constructive trust on the funds Summers "applied [ ] from the Wind Premium Trust Account and credited [ ] against loans which were delinquent, in default, or just as payments on loans which were current."

Van de Ven testified at trial that of the $346,597.00 removed from the Wind Premium Trust Account, Summers personally received $90,974.61 and Bank received $172,437.57.[2] Van de Ven arrived at those amounts by preparing a spreadsheet, Ex-

1. By the time of the trial, all claims against other defendants had been dismissed or settled except for the Bank and the Estate of Ted L. Summers. Insurance Company settled with Marilyn Summers, Summers' wife, and Jennifer Summers, Summers' daughter, individually for the amount of $7,500.00 and with the individual directors of Insurance Company in the amount of $83,474.61, representing the $90,974.61 Summers retained from the funds he removed from the Wind Premium Trust Account. The settlement with the indi-

vidual directors of Insurance Company arose out of an intervening petition filed by a policy holder of Insurance Company alleging Insurance Company's board of directors was negligent in failing to oversee the conduct of Summers.

2. The remaining $83,184.82 of the total $346,597.00 was attributed to other parties and entities not part of the underling judgment or this appeal.

hibit 11, of all the funds withdrawn from the Wind Premium Trust Account, approximately 445 transactions, and placing funds in columns of the person or entity that he determined "received" the funds.

The trial court entered judgment in favor of Insurance Company finding "Bank is the Trustee of a constructive trust in favor and for the benefit of [ ] Insurance Company in the sum of $126,789.63"[3] The trial court found of the $172,437.00 attributed to Bank by Van de Ven, Insurance Company did not show Bank was unjustly enriched as to $45,647.37 in payments of taxes and claims,[4] resulting in the amount of $127,789.63. Bank now appeals.

■ Bank raises eight points on appeal. We will address Bank's second point first because we find it is dispositive. In its second point, Bank contends the trial court erred in imposing a constructive trust because Insurance Company "failed to establish all the elements necessary for the imposition of a constructive trust in that [Insurance Company] failed to produce evidence of the res of the trust or to [ ] show any funds were still in the hands of Bank."

■ In a court-tried case, we will affirm the judgment unless it is not supported by substantial evidence, it is against the weight of the evidence, or it erroneously declares or applies the law. *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976).

■ Technically, constructive trusts are not trusts at all, but equitable devices employed by courts of equity. *Brown v. Brown*, 152 S.W.3d 911, 916 (Mo.App. W.D.2005). Constructive trusts arise " 'by operation of law, or, more accurately, by construction of the court, regardless and independently of any actual or presumed intention of the parties to create a trust[.]' " *Id.* (quoting *Schultz v. Schultz*, 637 S.W.2d 1, 4 (Mo. banc 1982)(internal quotation marks omitted)). " 'The constructive trust may be defined as the device used by chancery to compel one who unfairly holds a property interest to convey that interest to another to whom it justly belongs.' " *Id.* (quoting *Kerber v. Rowe*, 348 Mo. 1125, 156 S.W.2d 925, 927 (1941)(internal quotation marks omitted)).

■ "A court of equity may impose or declare a constructive trust to provide a remedy in cases where one who has acquired property under such circumstances as make it inequitable for him to retain it by making him or her a trustee for the person or persons injured thereby." *Brown v. Brown*, 152 S.W.3d 911, 916 (Mo. App. W.D.2005)(internal quotation marks omitted). Imposition of a constructive trust as a remedy to prevent unjust enrichment is appropriate under certain limited circumstances. *Blue Cross Health Services, Inc. v. Sauer*, 800 S.W.2d 72, 75 (Mo.App. E.D.1990). "However, the very essence of the remedy of a constructive trust is the identification of specific property or funds as the res upon which the trust may be attached." *Id.* at 76 (citing Bogert, *The Law of Trusts and Trustees 2d*, Section 471 at 9 (1978)). "To establish a constructive trust, evidence must be unquestionable in character and so clear, cogent and convincing as to exclude every reasonable doubt in the mind of the trial

---

3. The trial court also dismissed Insurance Company's claim against the Estate of Ted L. Summers.

4. In its judgment, the trial court stated Bank "did not unjustly benefit from the paying of taxes to Edwin Riggs of $1,223.83 nor the payment of claims of Moore, the Failore, Richards, Smith, Hummel, Fesseden, the Kaylors and Gibson in the sum of $44,423.54 as payments of claims to claimants or to the Bank on loans to claimants." This finding was supported by Exhibit 11 and the testimony at the trial.

court." *Dayton Const., Inc. v. Meinhardt,* 882 S.W.2d 206, 210 (Mo.App. W.D.1994); see also *John R. Boyce Family Trust v. Snyder,* 128 S.W.3d 630, 638 (Mo.App. E.D.2004).

Here, Bank asserts Insurance Company did not establish through clear, cogent, and convincing evidence any identifiable property or funds as the res upon which a constructive trust could be attached. In response to Bank's claim, Insurance Company suggests the funds can be traced to Bank's general operation account. However, review of the record reflects Insurance Company did not identify a res and its assertion that the res could be traced to the general operating account of Bank is not supported by clear, cogent, and convincing evidence from the trial.

Insurance Company's expert, Van de Ven, attributed seventy-five transactions to Bank for a total of $172,437.57 using Exhibit 11. Insurance Company did not present evidence on all seventy-five transactions attributed to Bank. When asked about the column for Bank on Exhibit 11, Van de Ven explained:

> [t]hese are items that were directed to the bank. Some of them were supported by money orders. Some of them were for—they had numbers of what appeared to be loan numbers. And then they were cleared through the bank. And most of them don't even carry an endorsement at the bank, so they never left the bank. They cleared right within the financial institution.

Of the transactions attributed to Bank testified to by Van de Ven, he could not and did not testify that any of the funds were deposited into Bank. For example, Van de Ven testified regarding check number 677. Exhibit 11, as prepared by Van de Ven, showed check number 677, dated July 1, 1995, in the amount of $1,170.25. The "To Whom" column pro-

vides "MONEY ORDER 015557" and the "Description" column provides "UN-KOWN." Further, the "Bank Description" column provides "No info on Check." The following exchange took place regarding check number 677:

> [Question by Insurance Company's counsel]. It's check number 677, is that right?
>
> [Van de Ven]. Yes, sir.
>
> Q. And its' payable July—it's dated July 1, 1995. And that was used to buy a money order, is that right?
>
> A. Yes, sir.
>
> Q. Do you have the money order? And who was the money order—
>
> A. Ralls County State Bank.
>
> Q. And are there any endorsements in the back, other than just to show it's deposited at the bank?
>
> A. No, sir. It shows it was cleared through the bank. It doesn't say—I think that's a clearance thing.

Van de Ven testified that he attributed the funds to Bank simply because they "cleared through" Bank without outside endorsement. Van de Ven never used the word "deposited" but rather always used the phrases like "cleared through the bank," "dealt within," "handled through," "it doesn't appear it left the bank," or "never left the bank." On redirect examination, when specifically asked about the money orders drawn from funds from the Wind Premium Trust Account made payable to Bank, Van de Ven was asked if "they were deposited in the Ralls County State Bank," to which Van de Ven answered:

> they were cleared through the Ralls County State Bank. It doesn't indicate on the back of the check that it was deposited anywhere. It just simply has the clearing from the Ralls County Bank

indicating that it didn't go outside to the Federal Reserve or anywhere else.

Insurance Company's expert did not and could not testify that the funds were deposited into Bank or into the general operating account of Bank.

Van de Ven also testified he attributed transactions to Bank because the check or money orders were signed by Summers, who was an agent of Bank. Van de Ven could not say whether cash was given to whoever presented the money orders. Further, he could not state whether Summers had written the check or purchased the money order and then been given cash in return. Van de Ven could not state with certainty the total amount attributed to Bank was for proper payments or as payments as a loss payee. In addition, Insurance Company's former President, Baker, testified that if Bank was listed as a loss payee it would have properly received payments.

Bank president, Behrens, testified that at the time of trial there was no record of where the misappropriated funds actually went. He testified that money orders from a bank do not require a bank employee's signature to be valid, but rather only the purchaser of a money order is required to sign the instrument. He also stated even when Bank is listed as the payee on a money order it does not mean Bank actually ever received the funds. If Bank is listed as payee on the money order, the individual bringing the instrument to Bank directs the application of the funds. Behrens testified that the individual with a money order could direct it to "be deposited, cashed, [or] paid on something." According to Behrens, the only way to determine if cash was received from the money orders was to reconcile the cash out slips and Insurance Company never reconciled the cash out slips.

After reviewing the record in this case, there is not clear, cogent, and convincing evidence showing where the funds attributed to Bank by Van de Ven went, whether the funds were deposited into Bank, or whether Bank retained those funds. The evidence is not so unquestionable in character and so clear, cogent and convincing as to exclude every reasonable doubt that the funds were deposited into Bank and can be traced into the general operating account of Bank.

Insurance Company failed to present clear, cogent, and convincing evidence identifying any specific funds as the res upon which the trust could be attached. Identification of the specific res is essential in establishing a constructive remedy. *Blue Cross Health Services, Inc.,* 800 S.W.2d at 75. Because we find Insurance Company did not identity the specific res, we reverse the judgment. Bank's second point is granted.[5]

Judgment reversed.

ROY L. RICHTER, P.J. and KURT S. ODENWALD, J., concur.

---

5. Because we find Bank's second point is dispositive, we need not address Bank's remaining seven points on appeal.